NORTH CAROLINA

FORSYTH COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS ___2414

| | |
|---|---|
| THRIVE INTEGRATED HEALTH, P.A.<br>AND LARI C. YOUNG,<br><br>Plaintiffs,<br><br>v.<br><br>BIOTE MEDICAL, LLC,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT FOR**
**DECLARATORY JUDGMENT**

COMES NOW Plaintiffs Thrive Integrated Health, P.A. ("Thrive") and Lari C. Young, M.D. ("Dr. Young") (collectively "Plaintiffs"), by and through the undersigned counsel, and pursuant to N.C. Gen. Stat. § 1-253 and Rule 57 of the North Carolina Rules of Civil Procedure, and complains of the Defendant, alleging that:

## PARTIES AND JURISDICTION

1. This action sets forth a claim for declaratory relief with respect to the question of whether Section 6.2(b) of the Services Agreement ("Agreement") is valid and enforceable under the laws of the State of Texas, and whether Defendant should be barred from enforcing Section 6.2(b) of the Agreement against Plaintiffs.

2. This Court has jurisdiction over this claim pursuant to N.C. Gen. Stat. § 1-253 and N.C. Gen. Stat. § 1A-1, Rule 57.

3. Plaintiff Thrive Integrated Health, P.A. is a professional association, organized and existing under the laws of the State of North Carolina, with its principal place of business in Forsyth County, North Carolina.

4. Plaintiff Dr. Young is a medical doctor, licensed by the State of North Carolina, and is the principal of Thrive.

5. Defendant BIOTE Medical, LLC ("Defendant") is a foreign limited liability company, organized and existing under the laws of the State of Texas, with its principal place of business in Irving, Texas.

1

6. Defendant is authorized by the North Carolina Secretary of State to conduct business within the State of North Carolina.

7. Defendant has a designated registered agent in Raleigh, Wake County, North Carolina.

8. Venue is proper in the General Court of Justice in Forsyth County, North Carolina.

## FACTUAL BACKGROUND

9. The foregoing allegations in the preceding paragraphs are re-alleged and incorporated by reference.

10. Thrive is a Winston-Salem medical practice whose principal is Dr. Young. Dr. Young practices solely out of her Winston-Salem office.

11. There are at least two other providers of BIOTE hormone replacement pellets in Winston Salem: Robinhood Integrative Health and Restoration MedSpa.

12. Thrive and Defendant entered into the Agreement on July 10, 2018. A copy of the Agreement is attached as Exhibit A and incorporated by reference.

13. Thrive contracted with Defendant to provide services and equipment related to pellet-based hormone replacement procedures.

14. The Agreement contains a residual benefit and non-competition clause contained in Section 6.2(b) of the Agreement.

15. Defendant alleges that Section 6.2(b) of the Agreement restricts Plaintiff's use of alternative or competing pellet-based bio-identical hormone therapy or treatment following termination of the Agreement.

16. The price of Defendant's products and services became cost prohibitive for Plaintiffs.

17. In a letter dated May 5, 2020, Defendant expressed its intent to terminate the Agreement. A copy of the letter ("Termination") is attached as Exhibit B and incorporated by reference.

18. In a letter dated May 27, 2020, Defendant demanded that Plaintiffs pay $104,499.96 pursuant to Section 6.2(b) of the Agreement if Plaintiffs wanted to

2

continue to provide medical care using pellet-based bio-identical hormone injections. A copy of the letter is attached as Exhibit C and incorporated by reference.

19.     Section 6.1 of the Agreement identifies "Confidential Information" as "any and all information related to the Therapy/Method, the Program Guidelines, instructional materials, conversations, negotiations, agreements, drafts agreements, Company policies and procedures, arrangements and understandings (whether written or oral), trade secrets, notes, memoranda, data ideas, processes, formulas, patents, programs, computer software and other information of whatever nature in the possession of the Company that is not known or available to the members of the general public or the Practice, or its representatives."

20.     Section 6.2(a) of the Agreement purports to prohibit Plaintiffs from practicing pellet-based hormone replacement injections for a period of two years throughout the State of North Carolina in order to protect the "Confidential Information" and the "business and goodwill of the Company".

## DECLARATORY JUDGMENT

21.     The foregoing allegations in the preceding paragraphs are re-alleged and incorporated by reference.

22.     Texas Civil Practice and Remedies Code § 37.004 sets forth that "a person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder."

23.     Texas Business and Commerce Code § 15.50(b) provides that a "covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent it contains limitations as to time, geographic area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promise." For a covenant not to compete "relating to the practice of medicine" to be enforceable it "must provide for a buy out of the covenant by the physician at a reasonable price or, at the option of either party, as determined by a mutually agreed upon arbitrator or, in the case of an inability to agree, an arbitrator of the court whose decision shall be binding on the parties." TEX. BUS. & COM. § 15.50(b)(2). Additionally, the "covenant must provide that the physician will not be prohibited from providing continuing care and treatment to a specific patient or patients during the course of an acute illness even

3

after the contract or employment has been terminated." Tex. Bus. & Com. § 15.50(b)(3).

24. The Agreement between the parties does not comply with the requirements of Texas Business and Commerce Code § 15.50. The Agreement between the parties is not an enforceable agreement under the statute. The Agreement does not contain reasonable limitations as to time, geographical area, and scope of activity. Further, the limitations exceed the scope of what would be necessary to protect the "Confidential Information" or the "business and goodwill" of Defendant. The Agreement does not contain a buyout clause. There is no language regarding buying out of all of the obligations set forth in § 6.2 of the Agreement. The "residual benefit" requirement set forth in § 6.2(b) does not alleviate the obligations of the non-competition provision. Rather, § 6.2(d) states the opposite, that all rights and remedies "are cumulative and not alternative." The Agreement also does not contain language providing that Plaintiffs would not be prohibited from providing continuing care and treatment to a specific patient or patients during an acute illness even after the contract or employment has been terminated. The Joinder to the Agreement signed by Dr. Young also fails to contain the statutory requirements.

25. Offering treatment to a patient of a competing product to the BIOTE hormone replacement pellet does not infringe upon the Confidential Information.

26. Defendant BIOTE has no less than two other providers in Winston-Salem offering the BIOTE hormone replacement pellets – one of which proclaims it has performed "more than one million insertions" of hormone replacement pellets since opening 7 years ago; therefore, the "business and goodwill" of the Defendant continues to be serviced by the other providers. Patients in Winston-Salem, NC who desire the BIOTE hormone replacement pellets still have options. As a comparison, Dr. Young only performed approximately 660 insertions over the course of almost 4 years.

27. Defendant BIOTE seeks to prevent Dr. Young and Thrive from being able to treat their patients with the best course of medical care as determined by Dr. Young.

28. Defendant BIOTE seeks to prevent Dr. Young from practicing medicine anywhere within the State of North Carolina even though her practice is centered in Winston-Salem, NC.

29. The Parties have an actual, justiciable controversy as to the rights and obligations of each in relation to the Agreement, and desire the Court declare the rights and obligations as to the following issues:

4

a.  Whether a contract under Texas law that limits the practice of medicine in North Carolina is enforceable?

b.  Is Section 6.2(b) of the Agreement valid and enforceable under the laws of the State of Texas and North Carolina?

c.  Is Defendant barred from enforcing Section 6.2(b) of the Agreement against Plaintiffs?

d.  Whether the services contracted for between the parties (Exhibit A to the Agreement) includes the exclusive purchase of hormone pellets from Defendant by Plaintiffs?

e.  Does the Agreement unlawfully restrict the practice of medicine in the State of North Carolina?

WHEREFORE, Plaintiffs pray the Court as follows:

1.  That the Court hold a hearing to declare the rights of the Parties as to the issues set out above;

2.  That the Court declare that Section 6.2(b) of the Services Agreement is not valid and enforceable under the laws of the State of Texas or North Carolina;

3.  That the Court declare that Defendant is barred from enforcing Section 6.2(b) of the Agreement against Plaintiffs;

4.  That the costs of this action, including court costs and reasonable attorney's fees be taxed against Defendant;

5.  For a trial by jury on all triable issues; and

6.  For any such other relief as the Court may deem just and proper.

This the 4th day of June, 2020.

Timothy Nerhood
NC State Bar No. 25432
Joshua Dearman
NC State Bar No.: 49154

5

OF COUNSEL:
**Hendrick Bryant Nerhood Sanders & Otis, LLP**
723 Coliseum Drive, Suite 101
Winston-Salem, NC 27106
Telephone: (336) 723-7200
Fax:  (336) 723-7201

6



## BioTE® MEDICAL, LLC SERVICES AGREEMENT

This Services Agreement ("Agreement") is effective as of Jul 10, 2018 (the "Effective Date") by and between BioTE® Medical, LLC (the "Company") and Thrive Integrated Health (the "Practice"). The Company and Practice may be collectively referred to as the "Parties" or individually as a "Party."

## RECITALS

WHEREAS, BioTE® Holding, LLC (d/b/a "BioTE® Medical Group") is the sole and exclusive owner of BioTE® Therapy/Method, a proprietary pellet-based, non-synthetic, bio-identical hormone treatment technology/method (the "Therapy/Method") and has given the Company the right to train and support medical groups and individuals in the use of the Therapy/Method;

WHEREAS, Practice is an entity which employs or otherwise contracts with licensed physicians, nurse practitioners, and/or physician assistants (collectively "Practitioners") to provide medical services to the Practice's patients;

WHEREAS, the Practice desires to receive training and support in the use of the Therapy/Method and the Company wishes to provide such training and support.

NOW, THEREFORE, for and in consideration of the mutual covenants and promises herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. **Engagement/Services.** The Company agrees to provide the Practice with the training, support and other services in the use of the Therapy/Method described in detail on Exhibit A (collectively the "Services"). This training and support will give the Practice a non-exclusive right to use the Therapy/Method solely for Practice patients ("Patients") at its Practice Location. For purposes of this Agreement Practice Location means the address or addresses listed on Exhibit B or any new or replacement Practice Location(s) where Practice renders professional services to its Patients on a full time and/or regular reoccurring basis. Any changes or additions to the Practice Locations are subject to prior written notice to the Company. The Practice understands and agrees that the Services provided by the Company are not exclusive to the Practice and that the Company has the right to provide other parties in businesses similar to the Practice similar Services and to authorize use of the Therapy/Method for treatment purposes in these other practices.

2. **Practice Obligations.**

2.1 **Practice Practitioners.** The Practice represents and warrants that all of the physicians, nurse practitioners, and physician assistants (collectively the "Practitioners") employed or otherwise engaged by Practice shall: (i) be duly licensed to practice medicine (or nursing as applicable) in the state in which the Practice does business (the "State"); (ii) be trained to provide the Therapy/Method in accordance with the terms and conditions set forth in this Agreement; (iii) as applicable, possess a valid and unrestricted State and federal DEA

Case 1:20-cv-00618-CCE-JLW    Document 2    Filed 07/07/20    Page 7 of 55

certification/registration, (iv) shall maintain all such licensure, compliance, certification and registration throughout the term of this Agreement; and (v) without limiting any of the foregoing, shall maintain all required professional credentials and meet all continuing education requirements and any other requirements necessary to retain Practitioner licensure in the State. Practice further represents and warrants that the individual executing this Agreement has the authority to bind the Practice and the Practitioners to all of the terms and conditions set forth in this Agreement. The Practitioners who are eligible to furnish the Therapy/Method to Patients are listed on Exhibit C. The Practice can add Practitioners upon written agreement of the Company and upon execution of a Joinder and amendment of Exhibit C. Practice acknowledges and agrees that the Company has the right to decline approval of any requested changes. Practice acknowledges and agrees to notify the Company to remove any certified Practitioner that is no longer is employed by Practice.

2.2     Adoption of Program Guidelines by Practice. On or around the Effective Date, Practice shall, in the exercise of the independent medical judgment of the Practitioners, adopt the Program Guidelines provided by the Company for use in the Practice with respect to the Therapy/Method. Notwithstanding the previous statement, adoption of Program Guidelines shall be subject to the exercise of independent medical judgment by each individual Practitioner with respect to the treatment of Patients. The Company may, from time to time, modify the Program Guidelines and shall notify Practice at the time of such modifications in writing.

2.3     Standards of Practice and Ethics. The Practice represents and warrants that Practice and each of its Practitioners understands all the medical and legal requirements related to the use of the Therapy/Method and will offer the Therapy/Method to Patients only when the responsible Practitioner has, in the exercise of his or her individual and independent medical judgment, determined that the Patient will benefit from the Therapy/Method. In connection with use of the Therapy/Method, the Practice will also communicate with its Patients regarding appropriate treatment alternatives. When medically appropriate, Practice shall provide the Therapy/Method to Patients in a manner consistent with the Program Guidelines and applicable law, and in accordance with the scope of each Practitioner's licensure and board certification. Practice shall be responsible for providing medical direction and supervision to all employees and contractors and shall insure that all such employees and contractors are duly licensed and performing their duties and responsibilities in accordance with State and federal law. The Practice shall also be solely responsible for any compensation owed to the Practitioners arising from their professional services. The execution of this Agreement shall not be construed to authorize any medical professional who is not identified on Exhibit C, as amended from time to time, to utilize the Therapy/Method. Under no circumstances shall a Practitioner utilize the Therapy/Method until the Practitioner has been added to Exhibit C and executed the Joinder attached as Exhibit D.

2.4     Independent Medical Judgment. Nothing in this Agreement is intended to create, nor shall it be construed to create, any right of the Company to intervene in any manner in the methods or means by which Practice or any Practitioner renders medical services to Patients.

2.5     Record Keeping.

(a)     Consistent with the Program Guidelines, Practice shall create and maintain records for each Patient receiving the Therapy/Method, including without limitation, all

medical and clinical records, patient files, administrative records, business and financial records, and other documentation related to the rendering of the Therapy/Method, as required by applicable law and as the Practice routinely produces in the usual course of business and as may be reasonably required by the Company (collectively the "Records"). Such Records shall be maintained in a legible, comprehensive, and chronological order and shall be treated as confidential in accordance with federal and State laws, and shall comply with the standard of care, state and federal laws regarding patient records.

(b) In furtherance of the foregoing obligation, Practice may access the dosingsite.com website provided by the Company, which will support the Practice in the provision of the Therapy/Method. Practice agrees that the Company shall have the right, without any obligation to Practice, to use such information obtained from the Practice and its Patients for its own purposes; provided, however, that Company agrees that any such information obtained shall be used solely in compliance with HIPAA to audit compliance by Practice. The Practice agrees to obtain all necessary consents and authorizations from Patients required for Practice to comply with the disclosure requirements contained in this Agreement, consistent with HIPAA and the laws of the State.

2.6 Required Notifications. Practice shall be solely responsible for notifying the Company in writing, within the time periods indicated, upon the Practice first obtaining actual notice or information of the occurrence of any of the following events:

(a) The license of Practice or any Practitioner to practice medicine or nursing, as applicable, in the State, or the DEA registration certificate, is restricted, suspended, revoked, or otherwise terminated; notification is required immediately, i.e., within twenty-four (24) hours;

(b) Practice, or any Practitioner receives written notice of a threatened or asserted claim, demand, action, or complaint alleging medical malpractice against Practice or Practitioner; notification is required within forty-eight (48) hours;

(c) Practice, or any Practitioner, is the subject of disciplinary action by any State licensing agency; notification is required within five (5) days;

(d) Practice, or any Practitioner, is indicted or convicted of a felony or a healthcare related misdemeanor; notification is required immediately;

(e) Practice plans to change its business address or Practice Location; notification is required thirty (30) days in advance;

(f) The Practice or any Practitioner is debarred or excluded from Medicare of any Medicaid program;

(g) Any act, event, or occurrence which materially affects a Practice's, or any Practice Practitioner's ability to carry out his or her duties and obligations under this Agreement; notification is required immediately;

2.7 Insurance Requirements; Cooperation.
(a) Practice shall obtain and maintain in full force and effect such policies of general liability, professional liability (malpractice), worker's compensation and other insurance as are necessary to comply with applicable State law and this Agreement.

Case 1:20-cv-00618-CCE-JLW    Document 2    Filed 07/07/20    Page 9 of 55

(b)    Notwithstanding the foregoing, if a claim for medical malpractice is made against any Party by a Patient, the Parties shall be available and actively cooperate with and assist each other in defending and participating in the preparation and tendering of any legal defense required for such claim.

2.8    Required Forms and Paperwork.  In order to help insure compliance with all applicable federal, State and local regulations and with all Company processes and protocols, Practice agrees to submit the following:  (i) the Company non-disclosure agreement to be signed by each of the Practitioners, the Practice manager and administrative staff members and all non-physician clinical personnel (including medical assistants); (ii) Credentialing Application completed by all Practitioners; (iii) State medical license(s), (iv) DEA license(s), (v) proof of current medical malpractice insurance for all Practitioner(s), and copies of Practice's insurance policies; (vi) the original signed copy of this Agreement (collectively, the "Company Forms and Paperwork").  The Practice will not be permitted to commence training until all Company Forms and Paperwork are properly filled out, signed if applicable, and submitted to Company along with payment of the required Fees described on Exhibit E.

2.9    Inspections and Access.  Consistent with the Program Guidelines, Practice shall permit the Company to evaluate the general operation of the Practice and use of the Therapy/Method through on-site inspection and review of the Records.  The Company's right to inspect shall relate exclusively to records and materials relating to provision of the Therapy/Method in connection with this Agreement.

3.    **Use of Company Intellectual Property.**  The Company and the Practice acknowledge and agree that the Parties have entered into a separate agreement whereby the Practice was granted a sublicense to use certain trademarks and intellectual property (the "Intellectual Property") in association with the provision of the Therapy/Method to Practice Patients.

4.    **Term and Termination.**

4.1    Term.  Unless terminated as described below, the term of this Agreement shall be for an initial period of three (3) years commencing as of the Effective Date and ending as of the third anniversary from such date (the "Initial Term") and shall automatically renew for subsequent one (1) year terms (each a "Subsequent Term") unless either Party provides written notification to the other of its intent not to renew the Agreement not less than ninety (90) days prior to the expiration of the then current term.  Except as otherwise set forth below, if this Agreement is terminated, subject to any terms which by their nature are intended to survive the termination of this Agreement, all rights of the Practice and Practitioners shall terminate.   Notwithstanding the foregoing, Practice may terminate this Agreement at any time without cause upon thirty (30) days prior written notice to the Company.

4.2    Termination for Cause.

Case 1:20-cv-00618-CCE-JLW    Document 2    Filed 07/07/20    Page 10 of 55

(a)     Either Party may terminate this Agreement upon the occurrence of a material breach by the other Party which is not cured within thirty (30) days written notice by the non-breaching Party.

(b)     The Company may terminate this Agreement immediately upon the occurrence of any of the following events: (i) the license of any Practitioner to practice medicine or nursing, as applicable, in the State, or DEA registration certificate, is restricted, suspended, revoked, restricted or otherwise terminated (whether voluntary or involuntary); (ii) any Practitioner is the subject of disciplinary action by any state or federal licensing agency; (iii) Practice or a Practitioner is indicted or convicted of a felony or a healthcare related misdemeanor; (iv) Practice or any Practitioner is suspended or excluded from participation in the Medicare or Medicaid program or any federal or state benefit program; (v) Practice fails to pay, in full, any fee or payment as and when due hereunder and such failure continues for a period of ten (10) days after written notice to Practice from Company; (viii) any Practitioner is unable to perform essential duties, responsibilities or functions of Practitioner's position as a result of any mental or physical disability or incapacity; (ix) Practice's or Practitioner's failure to comply with the Program Guidelines, or any amendments or supplements thereto; (x) the Practice closes.

4.3     Post-Termination Rights.  Upon the expiration or termination of this Agreement, all rights granted to the Practice under this Agreement shall terminate and immediately revert to the Company, and the Practice shall discontinue all use of the Intellectual Property authorized through the separate agreement described in paragraph 3.  The termination of this Agreement shall not relieve the Parties of any obligations which have accrued prior to the date of such termination, or obligations which by their nature are intended to survive termination of this Agreement.

5.     **Compensation.**  The Practice agrees to pay the Company the amounts set forth on Exhibit E as compensation for provision of Services by the Company.  Payments shall be made via ACH or credit card on the 1st and the 16th day of each calendar month.  Practice shall pay to the Company such compensation plus any additional amounts owed to the Company related to any other product sales beyond Management Fees unfunded at time of purchase.

6.     **Confidentiality.**

6.1     Nondisclosure and Confidential Information.  The Practice understands and acknowledges that the Company has developed and maintains unique concepts and techniques related to the Therapy/Method and the Services furnished to the Practice pursuant to this Agreement and further recognizes that the Company will be providing the Practice and its Practitioners with access to this and other Confidential Information.  The Practice agrees that it will keep all such information confidential and will not use this information to the detriment of the Company or disclose it except as otherwise permitted by this Agreement.  For purposes of this Agreement, "Confidential Information" means, without limitation, any and all information related to the Therapy/Method, the Program Guidelines, instructional materials, conversations, negotiations, agreements, draft agreements, Company policies and procedures, arrangements and understandings (whether written or oral), trade secrets, notes, memoranda, data ideas, processes, formulas, patents, programs, computer software and other information of whatever nature in the

LY

possession of the Company that is not known or available to members of the general public or the Practice, or its representatives. Confidential Information shall not include (i) information that is or becomes publicly available other than by acts of Practice, (ii) information already in Practice's possession at the time of its disclosure by the Company, (iii) information that is disclosed to Practice by a third party who is not otherwise prohibited from disclosing the information, and (iv) information that the Practice is required to disclose by reason of law, professional responsibility, order, decree or process, provided however that the Practice provides the Company with notice of such pending disclosures whenever feasible.

6.2    Non-competition. The Practice recognizes and acknowledges that the Company's decision to enter into this Agreement is induced in part by the covenants and assurances made by the Company to not disclose or otherwise inappropriately use Confidential Information furnished to the Practice by the Company or available to the Practice through its association with the Company, and that the Practice's covenant not to compete with the Company is necessary to ensure continuation of the Company's business and to protect the Confidential Information. The Practice further acknowledges and agrees that the Company will be irrevocably harmed if Practice or any of its Practitioners uses the Confidential Information to unfairly compete with the Company.

(a)    In consideration of the Practice's and its individual Practitioners' access to and use of the Company's Confidential Information, the benefits to be derived by the Practice and its Practitioners from such Confidential Information, to protect the business and goodwill of the Company, and the other mutual promises and considerations expressed in this Agreement, the receipt and sufficiency of which is acknowledged, the Practice agrees, on behalf of the Practice and its Practitioners, that for a period of two (2) years following termination for any reason whatsoever, the Practice and its Practitioners will refrain from, directly or indirectly, owning (excluding ownership of less than five percent (5%) of the equity of any publicly traded entity), managing, operating, controlling, or otherwise associating with or maintaining any interest whatsoever in any enterprise having to do with the provision, distribution, promotion, or advertising of any type of management or services or products to third parties in competition with the Company in the states in which the Company does business; and/or offering any type of collective Service(s) to third parties similar to those offered by the Company in the states in which the Company does business.

(b)    The Practice acknowledges and recognizes that its affiliation with the Company, the provision of Services, use of the Company's Intellectual Property, and the use of the Therapy/Method will result in a continued positive benefit for a period of time after the Practice and its Practitioners cease using the Therapy/Method and other Company Services (the "Residual Benefit"). The Practice also acknowledges and recognizes that as a result of this Residual Benefit, the Company is owed additional compensation in the event the Practice chooses to offer a similar or competing pellet based bio-identical hormone therapy or treatment to its Patients following termination of this Agreement. Therefore, if the Practice uses such alternative or competing pellet-based bio-identical hormone therapy or treatment following termination of the Agreement, the Practice agrees to compensate the Company for the Residual Benefit in an amount equal to the greater of; (a) $2000 – the minimum Residual Benefit Fee, or (b) the actual calculated best consecutive 3 months average Management Fee previously paid to BioTE during the previous 12 month period.

Case 1:20-cv-00618-CCE-JLW    Document 2    Filed 07/07/20    Page 12 of 55

Such Residual Benefit fees are payable on the first (1st) day of each month for a total of twelve (12) months.

(c)     The Practice and each Practitioner agree that during the term of this Agreement and for two (2) years following termination of the Agreement, neither Practice nor any Practitioner, or any of their respective affiliates shall, directly or indirectly, (i) induce or attempt to induce any employee or agent of the Company to leave the employ of or business relationship with Company, (ii) in any way interfere with the relationship between the Company or any Company employee or independent contractor, (iii) employ, or otherwise engage as an employee, independent contractor, or otherwise, any person who was an employee of or independent contractor to, Company at any time during the twelve (12) months prior to termination  without the prior written consent of Company, or (iv) induce or attempt to induce any client or other business relationship of the Company to cease doing business with the Company , or in any way interfere with the relationship between any client or other business relationship of Company.

(d)     Practice and each Practice Practitioner understand and acknowledge that the provisions of this Section 6.2 are designed to preserve the goodwill of the Company. Accordingly, if Practice or any Practitioner breaches any obligation of Section 6.2, then in addition to any other remedies available under this Agreement, at law or in equity, the Company shall have the right to obtain injunctive or other equitable relief to restrain any breach or threatened breach or otherwise to specifically enforce the provisions of this Agreement, it being agreed that money damages alone would be inadequate to compensate the Company and would be an inadequate remedy for such breach.  Such injunctive or other equitable relief shall restrain, among others, Practice's breach or threatened breach of Practice's covenants and agreements, or the Practitioners, affiliates, partners, or agents of Practice's violations of the same.  The Company shall recover from Practice any and all costs and expenses sustained or incurred by the Company in obtaining such injunctive or other equitable relief, including reasonable attorneys' fees.  Practice agrees that five hundred dollars ($500.00) is the amount of the bond to be posted by the Company if injunctive relief is obtained by the Company to enforce its rights pursuant to this Agreement.  If Practice fails to comply with the time restrictions in this Section 6.2, the restrictive time periods provided for will be extended by one day for each day the Practice is found to have failed to comply, up to a maximum of the length of the Non-Competition Period.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  If any provision of the covenants is held by a court of competent jurisdiction to be unenforceable due to an excessive time period, geographic area or restricted activity, the covenant shall be reformed to comply with such time period, geographic area, or restricted activity that would be held enforceable.

(e)     This Section 6 shall survive the termination of this Agreement for any reason.

7.     **Limitation of Liability.**

Case 1:20-cv-00618-CCE-JLW   Document 2   Filed 07/07/20   Page 13 of 55

NEITHER PARTY SHALL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, LOST PROFITS OR LOSS OF DATA) WHETHER THE BASIS OF LIABILITY IS BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY), STATUTE OR ANY OTHER LEGAL THEORY, EVEN IF THE OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE. NOTWITHSTANDING ANYTHING ELSE HEREIN (AND EXCEPT WHERE SUCH LIMITATIONS, EXCLUSIONS, AND INDEMNITIES ARE SPECIFICALLY PROHIBITED BY APPLICABLE LAW), THE TOTAL LIABILITY OF THE COMPANY AND ANY OF ITS AFFILIATES FROM ALL CAUSES OF ACTION AND UNDER ALL THEORIES OF LIABILITY SHALL BE LIMITED TO THE AMOUNT OF PAYMENTS ACTUALLY RECEIVED FROM PRACTICE DURING THE THREE (3) MONTHS PRECEDING THE DATE OF A CLAIM FOR LIABILITY ARISING HEREUNDER. THIS SECTION 7 SHALL NOT BE INTERPRETED TO LIMIT INDEMNIFICATION OTHERWISE PROVIDED HEREIN.

## 8. Miscellaneous Provisions.

8.1 Waiver of Breach. The failure of any Party to enforce at any time any provision of this Agreement (and related agreements between the Parties) shall not be construed as a waiver of such provision, nor in any way affect the validity of this Agreement (or any related agreements between the Parties) or the right of any Party thereafter to enforce each and every provision. No waiver of any breach of this Agreement (or any related agreements between the Parties) shall be held to constitute a waiver of any other breach, unless expressly done so in writing and signed by the Party against whom the waiver is asserted.

8.2 Severability. If any provision of this Agreement is rendered invalid or unenforceable by any act of Congress or of the State Legislature or by any regulation promulgated by officials of the United States or the applicable state agency, or declared invalid or unenforceable or null and void by any court of competent jurisdiction, such provision shall be severed from this Agreement and the remainder of the provisions of this Agreement shall remain in full force and effect.

8.3 Effect of Severable Provision. If a provision of this Agreement is rendered invalid or unenforceable or declared null and void as provided in Section 8.2 and its removal has the effect of materially altering the obligations of any Party in such manner as, in the judgment of the Party affected: (a) will cause serious financial hardship to such Party, (b) will substantially disrupt and hamper the mutual efforts of the Parties to implement the purposes of this Agreement, or (c) will cause such Party to act in violation of its Articles of Incorporation or Bylaws or equivalent organizational documents, the Party so affected shall have the right to terminate this Agreement upon ninety (90) days prior written notice to the other Party. During the notice period, each Party shall make a good faith effort to negotiate with the other Party to resolve the basis of the termination, and if such resolution is achieved to the satisfaction of each Party, the Agreement shall be modified to implement such resolution and, as so modified, shall continue in effect to the end of the then remaining term, subject, however, each Party's right to terminate in accordance with the Agreement as so modified.

Case 1:20-cv-00618-CCE-JLW   Document 2   Filed 07/07/20   Page 14 of 55

8.4    Amendments/Assignment. Except as otherwise provided, all amendments to this Agreement must be agreed to and executed in writing by the Parties in advance of the effective date. Notwithstanding the foregoing, amendments required because of legislative or regulatory enactments shall not require the consent of Practice or the Company and shall be deemed to have amended the Agreement as of the effective date of such enactment without any express action by the Parties. This Agreement may be assigned by the Company without permission of the Practice, but the Practice is expressly prohibited from assigning any rights or responsibilities set forth by this Agreement with prior written permission of the Company.

8.5    Authority, Approval and Enforceability. This Agreement has been executed, delivered and authorized by each Party and each has all requisite power and legal capacity to execute and deliver this Agreement and all other documents and agreements executed and delivered or to be executed and delivered in connection with the transactions contemplated by this Agreement; to consummate the transactions contemplated by this Agreement; and to perform its obligations under this Agreement. Upon execution and delivery, this Agreement will constitute the legal, valid and binding obligation of each Party, enforceable in accordance with its terms. Lastly, the execution and the delivery of this Agreement shall not result in a breach of any agreement to which either Party or violate any applicable laws to which it is subject

8.6    Notice. Any notice required or desired to be given under this Agreement shall be in writing and shall be sent by certified mail, return receipt requested, postage prepaid, or overnight courier, or hand delivery to the addresses set forth below. Notices given hereunder shall be deemed given upon documented receipt. The addresses to which notices are to be sent may be changed by written notice given to the other Party in the manner set forth in this Section 8.6.

| If to the Company: | BioTE® Medical, LLC<br>1875 W. Walnut Hill Lane, Suite 100<br>Irving, Texas 75038<br>Attn: Gary S. Donovitz M.D., CEO |
|---|---|
| Copies to: | Mary Elizabeth Conlon<br>The Conlon Law Firm, P.C.<br>8333 Douglas Avenue, Suite 1414<br>Dallas, Texas 75225 |
| If to the Practice: | Thrive Integrated Health |
| Copies to: | 2512 Reynolda Rd. Winston-Salem, NC 27106 |

2612904v.1021918                BioTE Medical Services Agreement

8.7     Headings. The headings of the sections contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

8.8     Gender. Whenever the masculine gender is used in this Agreement, it shall also mean and refer to the feminine gender whenever appropriate.

8.9     Governing Law; Venue. This Agreement shall be construed and enforced in accordance with the laws of the state of Texas without regard to its conflict of law's provisions. All suits permitted to be filed in a court of competent jurisdiction pursuant to the terms of this Agreement shall be resolved by a Texas state district court sitting in Tarrant County, Texas, and, if a federal claim or cause of action arises, in the federal courts located in Tarrant County, Texas, and each of the Parties consents to the jurisdiction of such courts, agrees to accept service of process by mail, and hereby waives any jurisdictional or venue defenses otherwise available to it with respect to such courts and/or such service of process, including but not limited to claims of forum non-conveniens.

8.10     Entire Agreement. All schedules and Exhibits to this Agreement are incorporated by reference into and made part of this Agreement. This Agreement constitutes the entire understanding and agreement of the Parties and supersedes any prior written or oral agreement pertaining to the subject matter.

8.11     Counterparts. This Agreement may be executed in several counterparts (which may include counterpart signed by facsimile), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

8.12     Mediation. The Parties shall, in good faith, attempt to settle any controversy or claim by any Party arising out of or relating to this Agreement by mediation. The Parties agree that, in the event that a conflict arises in the construction of this Agreement or in the exercise of any rights, obligations, responsibilities or duties, the disputing Party shall notify the other Party of such dispute. Upon receipt of such notice, the other Party shall have ten (10) business days to cure and resolve any such dispute. If such dispute cannot be resolved, the disputing Party shall then submit the dispute(s) to mediation (as defined in the Texas Civil Practice and Remedies Code) within sixty (60) days. In the selection of the mediator, the Parties shall each secure the names of five (5) mediators authorized by the Courts of Tarrant County, Texas and shall rank them in order of preference. The Parties will attempt, in good faith, to agree on a mediator from the Party lists. In the event the Parties cannot agree, they will ask a court of appropriate jurisdiction to appoint a mediator. The costs of mediation shall be borne by the Parties equally, unless the mediator assesses the costs otherwise. Except as otherwise set forth herein, if any Party commences formal legal proceedings or otherwise files any petition or complaint without first providing the opportunity to cure, and then participating in mediation pursuant to this paragraph, such Party shall bear the entire cost and expense of mediation. Notwithstanding the foregoing, the Company may bypass all provisions of this paragraph to initiate legal proceedings in order to obtain immediate injunctive relief, and after such relief is obtained, the Company shall proceed promptly with the dispute resolution.

8.13 <u>References</u>. Unless specifically noted otherwise, all references to any recital, paragraph, section, subsection, schedule, exhibit, or other provision are references to recitals, paragraphs, sections, subsections, schedules, exhibits, or other provisions in this Agreement.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their duly authorized officers or agents as of the Effective Date.

BioTE® Medical, LLC

By: *J Mark Hincher, RPh*
_____
BioTE Medical Executive

Thrive Integrated Health
_____
Practice or Business Name (Please Print)

By: _____

Print Title: MD, _____

Print Name: Lari Young _____

Case 1:20-cv-00618-CCE-JLW   Document 2   Filed 07/07/20   Page 17 of 55

# Exhibit A

## Services

1) <u>Initial Training</u>. The Company shall provide the following training to the Practice and its Practitioners (listed in Exhibit C):

   a) Initial Training in the use of the Therapy/Method, which training will be provided in a BioTE® approved training location prior to the date the Practice is authorized to begin using the Therapy/Method.

   b) All Practitioners participating in the training will be required to successfully complete both; (a) written or online test and (b) proctored clinicals before receiving authorization to use the Therapy/Method.

   c) The training shall include BioTE® training and educational services related to the methods, procedures, and protocols, including, without limitation, providing a BioTE® certified hormone replacement therapy training course to all Practitioners providing hormone replacement therapy and treatments on behalf of the Practice.

   d) The Company will provide lodging up to two (2) nights per Practitioner attending training and the Company will also provide lodging up to two (2) nights per Practice for one (1) additional room for ancillary staff attending training.

   e) Practice will have the responsibility to provide lodging for any ancillary staff beyond one (1) additional room as outlined in this agreement and the practice will bear responsibility for providing any additional lodging beyond the two (2) nights provided by the Company.

   f) The costs of travel to and from such training course, as well as meals to and from training, are the sole responsibility of Practice.

   g) As new Practitioners are added by the Practice, the Company will provide such additional Practitioners under the same terms and conditions as described above.

2) <u>Program Guidelines</u>. The Company will provide the Practice with the BioTE Program Guidelines for use as part of the Therapy/Method program, which Program Guidelines the Company may revise or amend at its sole discretion. Upon amendment of the Program Guidelines, the Practice will notify the Company of its intent to adopt the modifications.

3) <u>Marketing Support</u>. The Company shall provide the Practice with approved verbiage and logos to be used on Practice's existing website which will utilize the Company Intellectual Property described in paragraph 3 in order for Practice to market, advertise, and promote the Services (the "Practice Website"). Additionally, upon a Practitioner completing the training programs, the Company shall cause the certified and trained Practitioner's name, Practice's name, address, and telephone number to be appropriately listed on a BioTE Medical approved website or websites utilized by the Company or its affiliates for identifying to the public those physicians and medical professionals who have completed the BioTE® training. The Company reserves the right to add additional websites or change or replace the domain name for any website with new or different domain names at any time and will inform Practice of such changes. Practice shall engage in advertising and marketing of the Therapy/Method only as and in compliance with this Agreement, State

Case 1:20-cv-00618-CCE-JLW    Document 2    Filed 07/07/20    Page 18 of 55

licensing and professional practice laws and regulations and prevailing requirements regarding physician and/or medical professional advertisements.

4) <u>Other Services</u>: The Company will provide the Practice with the following other Services:

a) Access to the Dosingsite.com website,

b) Instructional Materials;

c) Inventory Management system for all pellets;

d) Additional marketing and support services to enhance the Practice ability to utilize the Therapy/Method;

e) Ongoing clinical consultation as needed to maximize the Practice's use of the Therapy/Method;

f) Complication reporting system;

g) Refresher trainings provided at no additional training fee. Refresher trainings are scheduled for both Practitioners and ancillary staff throughout the year. Locations, dates and times will be posted and distributed.

Case 1:20-cv-00618-CCE-JLW   Document 2   Filed 07/07/20   Page 19 of 55

## Exhibit B

## Practice Locations

The Practice is authorized to utilize the Therapy/Method at the following locations:

Practice Name: Thrive Integrated Health
Address: 2512 Reynolda Rd
City: Winston-Salem     State: NC     Zip Code: 27106
Country: USA

Practice Name: _____
Address: _____
City: _____ State: _____ Zip Code: _____
Country: _____

Practice Name: _____
Address: _____
City: _____ State: _____ Zip Code: _____
Country: _____

Practice Name: _____
Address: _____
City: _____ State: _____ Zip Code: _____
Country: _____

Practice Name: _____
Address: _____
City: _____ State: _____ Zip Code: _____
Country: _____

2612904v.1021918     **BioTE Medical Services Agreement**

## Exhibit C

## **Practitioners**

The following contractors or employees of the Practice are authorized to use the Therapy/Method:

Full Name: _____

Credentials: _____

Title: _____


Full Name: _____

Credentials: _____

Title: _____


Full Name: _____

Credentials: _____

Title: _____


Full Name: _____

Credentials: _____

Title: _____


Full Name: _____

Credentials: _____

Title: _____


Full Name: _____

Credentials: _____

Title: _____

2612904v.1021918

**BioTE Medical Services Agreement**

## Exhibit D

## Joinder

I acknowledge and understand that I have the opportunity to receive training to provide the BioTE® Therapy/Method (the "Therapy/Method") pursuant to certain agreement(s) between the medical practice with whom I work (the "Practice") and BioTE® Medical, LLC (the "Company").

Prior to the receipt of any training to provide the Therapy/Method, I promise, represent and warrant to the Company that:

LY ____ I am duly licensed to practice medicine (or nursing as applicable) in the state in which the Practice does business (the "State"), and I, as applicable, possess a valid and unrestricted State and federal DEA certification/registration;

LY ____ I will maintain all licensure, compliance, certification and registration throughout my participation in providing the Therapy/Method, and will maintain all required professional credentials and meet all continuing education requirements to retain licensure in the State;

LY ____ I will exercise independent medical judgment with respect to the treatment of patients; and,

LY ____ The execution and performance of this Joinder does not require the consent of any third party, and will not conflict with or violate any agreement to which I am a party.

Prior to the receipt of any training to provide the Therapy/Method, I agree to and acknowledge the following:

LY ____ The Company has developed and maintains unique concepts and techniques related to the Therapy/Method to which I will receive access, along with other Confidential Information (as defined in the nondisclosure agreement I signed) belonging to the Company. In consideration of my access to and use of the Company's Confidential Information, the benefits to be derived from such Confidential Information, and to protect the business and goodwill of the Company, I agree that for a period of two (2) years following the termination of the business relationship between the Practice and the Company, or the Practice and me, for any reason whatsoever, I will refrain from, directly or indirectly:

LY ____ owning (excluding ownership of less than five percent (5%) of the equity of any publicly traded entity), managing, operating, controlling, or otherwise associating with or maintaining any interest whatsoever in any enterprise having to do with the provision, distribution, promotion, or advertising of any type of management or services or products to third parties in competition with the Company in the states in which the Company does business and/or offering any type of collective service(s) to third parties similar to those offered by the Company in the states in which the Company does business;

LY ____ interfering in any way with the relationship between the Company and any of its employee(s), agent(s), or independent contractor(s);

LY ____ employing, or otherwise engaging as an employee, independent contractor, or otherwise, any person who was an employee of or independent contractor to, Company at any time during the twelve (12) months prior to termination of the business relationship with the Practice as set forth above; or,

LY ____ inducing or attempting to induce any client or other business relationship of the Company to cease doing business with the Company, or interfering in any way with the relationship between any client or other business relationship of Company.

LY ____ If I breach any obligation or provision of this Joinder, then in addition to any other remedies available to the Company, at law or in equity, the Company shall have the right to obtain injunctive or other equitable relief to restrain any breach or threatened breach or otherwise to specifically enforce the provisions of this Joinder, it being agreed that money damages alone would be inadequate to compensate the Company and would be an inadequate remedy for such breach. I further agree that five hundred dollars ($500.00) is the amount of the bond to be posted by the Company if injunctive relief is obtained by the Company to enforce its rights pursuant to this Joinder. If I fail to comply with the time restrictions in this Joinder, the restrictive time periods provided for will be extended by one day for each day I am found to have failed to comply, up to a maximum of the length of two (2) years. If any provision of the covenants herein is held by a court of competent jurisdiction to be unenforceable due to an excessive time period, geographic area or restricted activity, the covenant shall be reformed to comply with such time period, geographic area, or restricted activity that would be held enforceable.

By: _____

Print Title: MD, _____

Print Name: Lari Young _____

Date: Jul 10, 2018 _____

2612904v.1021918     **BioTE Medical Services Agreement**

Case 1:20-cv-00618-CCE-JLW    Document 2    Filed 07/07/20    Page 23 of 55

## Exhibit E

## Compensation/Fees

**Compensation/Fees.** The Practice shall pay the Company the following fees ("Training Fees" and "Usage Fees" as defined below may be referred to collectively as the "Fees"):

(i)  Training Fee.  A one-time training fee of Three Thousand Five Hundred Dollars ($3,500), which includes one Practitioner.  An additional fee of Seven Hundred Dollars ($700) for each additional Practitioner receiving training shall be paid (the "Training Fees").  The Training Fees shall be payable on the Effective Date and before training date. There are no fees for ancillary staff that attend training.

(ii)  Management Fees.  For all other Services provided pursuant to this Agreement, the Practice shall pay the Company a "Management Fee" which is an amount equal to the sum of the Applicable Fees multiplied by the number of Patients treated in each Applicable Fee group.  The Management Fees are payable with submission of the Bi-Monthly Reports on the 1st and 16th day of each month.  If Fees are not paid timely, the Company will be charged interest at the rate of 18% per annum (1.5% per month), calculated daily on the total unpaid Fees, retroactive to the date payment was due.

(a)  The "Management Fee" shall initially be $180 for all female Patients and $420 for male Patients and the Applicable Fee payable to the Company shall be reduced based on the Practice achieving the following threshold numbers of New Patients:

(i)  $180 for Females, $420 for Males while the Practice has attained 0-100 New Patients;

(ii)  $165 for Females, $385 for Males while the Practice has attained 101-300 New Patients;

(iii)  $150 for Females, $350 for Males while the Practice has attained 301 New Patients;

For purposes of this Agreement, "New Patients" means Patients who first receive treatment through the Therapy/Method at the Practice through one of its Practitioners.  The number of New Patients is calculated over the Term of the Agreement, beginning on the Effective Date and is cumulative over the Term.  If the number of New Patients reaches the next Management Fee threshold during a reporting period, upon notification to the Company, the new Management Fee will be applied to the next complete and unopened reporting period.  Once a new Management Fee is obtained, due to exceeding the minimum number of New Patients as outlined above, and updated, all subsequent Management Fees will be calculated at the new rate.

Case 1:20-cv-00618-CCE-JLW    Document 2    Filed 07/07/20    Page 24 of 55

b)      Practice shall submit online through mybiote.com any discounts offered from the retail price of the Therapy/Method and shall track and record all discounts to individuals.  For purposes of this Agreement, discounts means:

(i)      BioTE® Certified Practitioners receive pellets at no charge,

(ii)     BioTE® Certified Practitioner spouse receives pellets at a 50% discount,

(iii)    Full-time staff of BioTE® Certified Practitioners receive pellets at no charge,

(iv)     Physician Liaisons with BioTE® Medical receive pellets at no charge, and

(v)      Physician Liaison spouse with BioTE® Medical receives pellets at 50% discount.

On the 1st and the 16th day of each calendar month, starting immediately following the Effective Date, consistent with the Program Guidelines, the Practice shall generate and timely submit Bi-Monthly Reports of Patients who have received the Therapy/Method since the prior report.  The Bi-Monthly Reports shall be in form and substance as provided by Company to the Practice and consistent with the Program Guidelines as may be as amended from time to time.  Failure to timely submit the Bi-Monthly Reports can lead to failure to update the Management Fee as described above.

Case 1:20-cv-00618-CCE-JLW    Document 2    Filed 07/07/20    Page 25 of 55

**ADDENDUM TO BIOTE® MEDICAL SERVICES AGREEMENT**

This addendum modifies and supplements the BioTE Medical Services Agreement. The Company and the Practice agree as follows:

**Exhibit E, Compensation and Fees:**

(i) Training Fee. Company agrees that the Practice has previously satisfied the financial obligation of the one-time training fee of Three Thousand Five Hundred Dollars ($3,500.00). The only training fee the Practice would be obligated to pay is the Seven Hundred Dollars ($700.00) Training Fee for any new Additional Practitioner requesting certification.

(ii) Management Fees. The number of New Patients accumulated by the Practice as of the date of this agreement will remain in effect. Entering into this agreement will not reset or reduce the number of New Patients.

BioTE® Medical, LLC

By: *J Mark Hincher, RPh*

BioTE Medical Executive

## Thrive Integrated Health

Practice or Business Name

By: *Lari Young*

Print Title: MD,

Print Name: Lari Young

Case 1:20-cv-00618-CCE-JLW    Document 2    Filed 07/07/20    Page 26 of 55

# BioTE® MEDICAL, LLC BUSINESS ASSOCIATE AGREEMENT

This Privacy Agreement ("Agreement"), is effective upon signing this Agreement and is entered into by and between BioTE® Medical, LLC ("Covered Entity") and VENDOR (the "Business Associate").

**1. Term.** This Agreement shall remain in effect for the duration of this Agreement and shall apply to all of the Services and/or Supplies delivered by the Business Associate pursuant to this Agreement.

**2. HIPAA Assurances.** In the event Business Associate creates, receives, maintains, or otherwise is exposed to personally identifiable or aggregate patient or other medical information defined as Protected Health Information ("PHI") in the Health Insurance Portability and Accountability Act of 1996 or its relevant regulations ("HIPAA") and otherwise meets the definition of Business Associate as defined in the HIPAA Privacy Standards (45 CFR Parts 160 and 164), Business Associate shall:

(a) Recognize that HITECH (the Health Information Technology for Economic and Clinical Health Act of 2009) and the regulations thereunder (including 45 C.F.R. Sections 164.308, 164.310, 164.312, and 164.316), apply to a business associate of a covered entity in the same manner that such sections apply to the covered entity;

(b) Not use or further disclose the PHI, except as permitted by law;

(c) Not use or further disclose the PHI in a manner that had BioTE Medical done so, would violate the requirements of HIPAA;

(d) Use appropriate safeguards (including implementing administrative, physical, and technical safeguards for electronic PHI) to protect the confidentiality, integrity, and availability of and to prevent the use or disclosure of the PHI other than as provided for by this Agreement;

(e) Comply with each applicable requirement of 45 C.F.R. Part 162 if the Business Associate conducts Standard Transactions for or on behalf of the Covered Entity;

(f) Report promptly to BioTE Medical any security incident or other use or disclosure of PHI not provided for by this Agreement of which Business Associate becomes aware;

(g) Ensure that any subcontractors or agents who receive or are exposed to PHI (whether in electronic or other format) are explained the Business Associate obligations under this paragraph and agree to the same restrictions and conditions;

(h) Make available PHI in accordance with the individual's rights as required under the HIPAA regulations;

(i) Account for PHI disclosures for up to the past six (6) years as requested by Covered Entity, which shall include: (i) dates of disclosure, (ii) names of the entities or persons who received the PHI, (iii) a brief description of the PHI disclosed, and (iv) a brief statement of the purpose and basis of such disclosure;

(j) Make its internal practices, books, and records that relate to the use and disclosure of PHI available to the U.S. Secretary of Health and Human Services for purposes of determining Customer's compliance with HIPAA;

LY

Case 1:20-cv-00618-CCE-JLW    Document 2    Filed 07/07/20    Page 27 of 55

(k) Incorporate any amendments or corrections to PHI when notified by Customer or enter into a Business Associate Agreement or other necessary Agreements to comply with HIPAA.

3. **Termination Upon Breach of Provisions**. Notwithstanding any other provision of this Agreement, Covered Entity may immediately terminate this Agreement if it determines that Business Associate breaches any term in this Agreement. Alternatively, Covered Entity may give written notice to Business Associate in the event of a breach and give Business Associate five (5) business days to cure such breach. Covered Entity shall also have the option to immediately stop all further disclosures of PHI to Business Associate if Covered Entity reasonably determines that Business Associate has breached its obligations under this Agreement. In the event that termination of this Agreement and the Agreement is not feasible, Business Associate hereby acknowledges that the Covered Entity shall be required to report the breach to the Secretary of the U.S. Department of Health and Human Services, notwithstanding any other provision of this Agreement or Agreement to the contrary.

4. **Return or Destruction of Protected Health Information upon Termination**. Upon the termination of this Agreement, unless otherwise directed by Covered Entity, Business Associate shall either return or destroy all PHI received from the Covered Entity or created or received by Business Associate on behalf of the Covered Entity in which Business Associate maintains in any form. Business Associate shall not retain any copies of such PHI. Notwithstanding the foregoing, in the event that Business Associate determines that returning or destroying the Protected Health Information is infeasible upon termination of this Agreement, Business Associate shall provide to Covered Entity notification of the condition that makes return or destruction infeasible. To the extent that it is not feasible for Business Associate to return or destroy such PHI, the terms and provisions of this Agreement shall survive such termination or expiration and such PHI shall be used or disclosed solely as permitted by law for so long as Business Associate maintains such Protected Health Information.

5. **No Third-Party Beneficiaries**. The parties agree that the terms of this Agreement shall apply only to themselves and are not for the benefit of any third-party beneficiaries.

6. **De-Identified Data**. Notwithstanding the provisions of this Agreement, Business Associate and its subcontractors may disclose non-personally identifiable information provided that the disclosed information does not include a key or other mechanism that would enable the information to be identified.

7. **Amendment.** Business Associate and Covered Entity agree to amend this Agreement to the extent necessary to allow either party to comply with the Privacy Standards, the Standards for Electronic Transactions, the Security Standards, or other relevant state or federal laws or regulations created or amended to protect the privacy of patient information. All such amendments shall be made in a writing signed by both parties.

8. **Interpretation.** Any ambiguity in this Agreement shall be resolved in favor of a meaning that permits Covered Entity to comply with the then most current version of HIPAA and the HIPAA privacy regulations.

_LY_

Case 1:20-cv-00618-CCE-JLW   Document 2   Filed 07/07/20   Page 28 of 55

9. **Definitions**. Capitalized terms used in this Agreement shall have the meanings assigned to them as outlined in HIPAA and its related regulations.

10. **Survival**. The obligations imposed by this Agreement shall survive any expiration or termination of this Agreement.

BioTE® Medical, LLC

By: _J Mark Hincher, RPh_
BioTE Medical Executive

Thrive Integrated Health
Vendor Practice or Business Name (Please Print)

By: _Lari Young_

Print Title: MD,

Print Name: Lari Young

Date: Jul 10, 2018

Case 1:20-cv-00618-CCE-JLW    Document 2    Filed 07/07/20    Page 29 of 55

# BioTE® MEDICAL, LLC TRADEMARK LICENSING AGREEMENT

This Trademark Licensing Agreement ("Agreement") is effective as of Jul 10, 2018 (the "Effective Date") by and between BioTE® Medical, LLC (the "Company") and Thrive Integrated Health (the "Practice"). The Company and Practice may be collectively referred to as the "Parties" or individually as a "Party."

## RECITALS

**WHEREAS**, BioTE® Holding, LLC (d/b/a "BioTE® Medical Group") is the sole and exclusive owner of BioTE® Therapy/Method, a proprietary pellet-based, non-synthetic, bio-identical hormone treatment technology/method (the "Therapy/Method") as well as the associated trademarks and intellectual property set forth on Exhibit A (the "Intellectual Property"), and has given the Company the license to use and sublicense the Intellectual Property rights to medical groups and individuals who have been trained in the use of the Therapy/Method;

**WHEREAS**, Practice is an entity which employs or otherwise contracts with licensed physicians, nurse practitioners, and/or physician assistants (collectively "Practitioners") to provide medical services to the Practice's patients;

**WHEREAS**, the Company, has trained the Practice in the use of the Therapy/Method and wishes to grant the Practice a sublicense to use the Intellectual Property in connection with the Therapy/Method for the Practice's patients (the "Sublicense");

**WHEREAS**, the Practices desires to obtain the Sublicense and the right to use the Intellectual Property in connection with Practice's provision the Therapy/Method.

**NOW, THEREFORE**, for and in consideration of the mutual covenants and promises herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## 1.    Sublicense.

1.1    The Company hereby grants to the Practice the non-exclusive right and sublicense to use the Intellectual Property in connection with the use of the Therapy/Method for Practice patients ("Patients") at its Practice Location. For purposes of this Agreement Practice Location means the address or addresses listed on Exhibit B of the BioTE Medical, LLC Services Agreement. Any changes or additions to the Practice Locations are subject to prior written notice to the Company. It is understood and agreed this Sublicense shall pertain only to the provision of the Therapy/Method to Patients at the Practice Location(s), and does not extend to any other use, service or product. The Practice understands and agrees that this Sublicense is non-exclusive, that other parties may also have non-exclusive rights and/or sublicenses to use the Intellectual Property in businesses similar to the Practice's and that the Company itself may use and continue to sublicense others to use the Intellectual Property.

LY

Case 1:20-cv-00618-CCE-JLW    Document 2    Filed 07/07/20    Page 30 of 55

1.2     The Company shall use commercially reasonable efforts to protect the Intellectual Property and shall defend, at the Company's expense, any third-party claims of infringement or unfair competition brought against the Practice in connection with the Practice's proper use of the Intellectual Property. The defense, settlement and handling of any such claim for infringement or unfair competition shall be as determined by the Company in its sole discretion.

1.3     The Practice shall give the Company written notice of (i) any conduct which comes to its attention and which appears to infringe or constitute a conflicting use of the Intellectual Property, and (ii) any claim or assertion by any person, whether or not made in a legal action, that the Intellectual Property infringes on any rights of a third party. When requested, the Practice shall cooperate with and assist the Company, in its efforts to stop an infringement or other violation of the Company's rights with respect to the Intellectual Property.

## 2.     Notices and Quality Control.

2.1     The grant of this Sublicense is conditioned upon the Practice's full and complete compliance with the terms and conditions of the Services Agreement. The Services Agreement sets forth the terms and conditions under which the Practice uses the Therapy/Method for its Patients.

2.2     The Practice shall not, without the prior written consent of the Company which consent is in the Company's sole and absolute discretion, (i) change or modify the Intellectual Property, or create any design variation of the Intellectual Property, (ii) join any name, mark or logo with the Intellectual Property so as to form a composite trade name or mark, (iii) use the Intellectual Property at a site or location other than the Practice Location, or use the Intellectual Property in connection with any other hormone replacement therapy other than The BioTE® Therapy/Method.

2.3     Upon written notice to the Practice, the Company may, from time to time in its sole discretion, elect to (i) discontinue any Intellectual Property, and/or (ii) replace any Intellectual Property with or use new or different trademarks or service marks (the "New IP"). Upon such election, any such New IP shall automatically be designated Intellectual Property as such shall be subject to the terms of this Agreement. The Company will amend Exhibit A to include such New IP and will provide the Practice with a copy of the amended Exhibit A. The Company shall have the right to amend Exhibit A without approval, consent or prior notice to the Practice. In the event the Company discontinues any Intellectual Property or introduces New IP, the Practice shall have a reasonable period of time, not to exceed one (1) month, to cease use of such discontinued Intellectual Property or begin use of such New IP.

2.4     At all times, the Practice shall use the Intellectual Property only in accordance with such quality standards and specifications as may be established or required by this Agreement and such other or additional standards and specifications as may be established by the Company and communicated to the Practice in writing from time to time (the "Quality Standards"). Without limiting the foregoing, the products and services provided by the Practice shall always be or performed in a manner that reflects favorably on the Intellectual Property and does not tarnish them or the reputation of the Company or BioTE Medical Group. With respect to the name and

LY

Case 1:20-cv-00618-CCE-JLW   Document 2   Filed 07/07/20   Page 31 of 55

mark "BioTE®" and the "BioTE®" logo, the Company may establish additional Quality Standards that shall be communicated to the Practice in writing from time to time.

2.5     All use of the Intellectual Property shall faithfully reproduce the design and appearance of the Intellectual Property as reflected in the registrations or applications listed on Exhibit A, or as otherwise instructed by the Company in writing. The Company or its designated representative shall have the right at any time during normal business hours to inspect and approve, which approval shall not be unreasonably withheld, any and all uses of the Intellectual Property to confirm that such use is in conformance with the terms of this Agreement.  From time to time, upon the Company's reasonable request in writing, the Practice shall, at the Practice's expense, (i) provide the Company with representative samples of the ways in which the Intellectual Property are then being used (or photographs depicting the same), and (ii) permit the Company to inspect the Practice's places of business where the Intellectual Property are used, in each case for the Company's inspection and approval of such uses.

2.6     If the Company reasonably believes that uses of the Intellectual Property are not being conducted in compliance with the Company's Quality Standards or if an inspection of the use of the Intellectual Property reveals that they do not comply with the Company's Quality Standards, then the Company shall promptly provide the Practice with written notice of such defects or violations, and shall allow the Practice thirty (30) days from the date of such notice in which to cure such defects or violations.  Should the defects or violations not be remedied within thirty (30) days, the Company may, in its reasonable discretion, terminate this Agreement or bring an action to require specific performance.  If such an action is brought and is successful, then the Practice shall have thirty (30) days within which to comply with the order.  If, at the end of thirty (30) days the Practice has not complied, this Agreement will terminate automatically.

2.7     The Practice shall use the Intellectual Property only in such manner as will comply with the provisions of applicable laws and regulations relating to the Intellectual Property.  the Practice shall affix to all Intellectual Property materials that bear a licensed mark, including, but not limited to, all stationery, labels, packaging, advertising and promotional materials, manuals, invoices and all other printed materials, (i) notices in compliance with applicable trademark laws, and (ii) such legend as the Company may reasonably designate by written notice and is required or otherwise reasonably necessary to allow adequate protection of the Intellectual Property and the benefits thereof under applicable trademark laws from time to time. Specifically, the Practice may use the following legend:

"BioTE®" is a registered trademark owned by BioTE® Holding, LLC and is used under license."

3.     **Intellectual Property Rights.**

3.1     The Practice acknowledges the Company's exclusive rights in the Intellectual Property and, further, acknowledges that the Intellectual Property is unique and that the Practice has no right, whatsoever, to sublicense or assign these rights to any party without the Company's express written permission.  The Practice shall not, at any time during or after the Term, dispute or contest, directly or indirectly, the Company's exclusive right and title to the Intellectual Property

LY

2595245v.23          **BioTE Medical Trademark Licensing Agreement**

or the validity thereof. The Company makes no representation or warranty with respect to the validity of any of its issued or pending patents or copyrights.

3.2    The Practice agrees that its use of the Intellectual Property inures to the benefit of the Company and BioTE® Medical Group and that the Practice shall not acquire any ownership rights in the Intellectual Property, or in any improvements in the Intellectual Property as a result of this Sublicense. Notwithstanding the foregoing, if the Practice acquires any rights in the Intellectual Property, it will immediately, at no expense to the Company, assign all such rights to the Company. The Practice will not grant or attempt to grant a security interest in the Intellectual Property or any of its rights under this Agreement.

3.3    The Practice shall not disparage or intentionally take any action, or encourage others to take any action that might harm the Company's Intellectual Property, or rights to the Intellectual Property. The Practice agrees not to take any action inconsistent with the Company's ownership and/or rights in the Intellectual Property.

3.4    Any derivative works, improvements, discoveries, adaptations, designs, and processes, relating to the Intellectual Property shall be owned by and remain the sole property of the Company even if it is conceived, developed, reduced to practice, acquired, or obtained by the Practice or a third party. The Practice agrees to and shall execute and file, as appropriate, such documents necessary or appropriate to effectuate such rights in the Company.

## 4.    **Term and Termination.**

4.1    Term. The term of this Agreement shall commence on the Effective Date and continue until such time as the Agreement is terminated as described below (the "Term").

4.2    Termination. The Company may terminate this Agreement upon any of the following, each of which constitutes an "Event of Default":

a.    Immediately and without prior notice (unless required by local law) upon any of the following:

i.    Any unauthorized use by the Practice of the Intellectual Property;

ii.    The Practice's knowing submission of any false or incomplete records or other information to the Company;

iii.    The attempted or actual transfer or grant of any rights under this Agreement to any third party without the Company's prior written consent, such consent to be provided at the sole discretion of the Company;

iv.    The Practice's failure to use the Intellectual Property in accordance with the terms of this Agreement;

v.    Termination or expiration of the Services Agreement; or

_Ly_

Case 1:20-cv-00618-CCE-JLW    Document 2    Filed 07/07/20    Page 33 of 55

vi.    The filing for dissolution or bankruptcy of the Practice.

b.    Upon the Practice's failure to timely make a payment due to the Company unless cured within such fifteen (15) day period after written notice (or such longer period as may be required by local law);

c.    Thirty (30) days after written notice upon the violation of, or failure to satisfy, the obligations of any other provision of this Agreement, unless cured within such thirty (30) day period.

4.3    Post-Termination Rights.

a.    Upon the expiration or termination of this Agreement, all rights granted to the Practice under this Agreement shall terminate and immediately revert to the Company, and the Practice shall discontinue all use of the Intellectual Property. The termination of this Agreement shall not relieve the Parties of any obligations which have accrued prior to the date of such termination, or obligations which by their nature are intended to survive termination of this Agreement.

b.    Upon expiration or termination of this Agreement, the Company may require that the Practice transmit to the Company, at no cost to the Company, all material relating to the Intellectual Property. The Practice shall return all such requested Intellectual Property to the Company within ten (10) days of receipt of such request from the Company.

5.    **Intellectual Property Fees.**

5.1    No Fees. The Company's agreement to sublicense the Intellectual Property is contingent on the Practice's execution and continued participation in the Services Agreement, and this contingency is consideration in full for the Intellectual Property sublicense pursuant to this Agreement.

6.    **Confidentiality.**

6.1    Confidentiality of Agreement. Each Party shall keep this Agreement and its contents confidential and agrees not to disclose this Agreement or its contents to any third party other than its legal and financial advisors and appropriate Practice personnel, or otherwise as required by law, without the consent of the other Party.

6.2    Confidentiality of Information. In connection with its obligations under this Agreement, each Party may make use of certain confidential information of the other Party, including without limitation, management reports, financial statements, internal memoranda, protocols, policies, confidential technology and other materials, records and information of a proprietary nature (collectively the "**Confidential Information**"). Neither Party, its employees and agents, will use or disclose Confidential Information except in connection with the performance of obligations pursuant to this Agreement, or

LY

Case 1:20-cv-00618-CCE-JLW   Document 2   Filed 07/07/20   Page 34 of 55

divulge Confidential Information to any third party, unless the other Party consents in writing or disclosure is required by law. If either Party receives a request or demand for the disclosure of Confidential Information, such Party shall immediately provide written notice to the other Party. Upon termination of this Agreement, each Party and any employee or agent shall immediately return the Confidential Information to the other Party, or if return is not feasible, certify either (i) the destruction of all Confidential Information (and all copies thereof) of any kind belonging to the other Party. Without limiting other possible remedies for the breach of this covenant, the Parties agree that injunctive or other equitable relief shall be available to enforce this covenant, such relief to be without the necessity of posting a bond, cash or otherwise.

7. **Limitation of Liability.**

NEITHER PARTY SHALL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, LOST PROFITS OR LOSS OF DATA) WHETHER THE BASIS OF LIABILITY IS BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY), STATUTE OR ANY OTHER LEGAL THEORY, EVEN IF THE OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE. NOTWITHSTANDING ANYTHING ELSE HEREIN (AND EXCEPT WHERE SUCH LIMITATIONS, EXCLUSIONS, AND INDEMNITIES ARE SPECIFICALLY PROHIBITED BY APPLICABLE LAW), THE TOTAL LIABILITY OF THE COMPANY AND ANY OF ITS AFFILIATES FROM ALL CAUSES OF ACTION AND UNDER ALL THEORIES OF LIABILITY SHALL BE LIMITED TO THE AMOUNT OF PAYMENTS ACTUALLY RECEIVED FROM PRACTICE DURING THE THREE (3) MONTHS PRECEDING THE DATE OF A CLAIM FOR LIABILITY ARISING HEREUNDER. THIS SECTION 7 SHALL NOT BE INTERPRETED TO LIMIT INDEMNIFICATION OTHERWISE PROVIDED HEREIN.

8. **Miscellaneous Provisions.**

8.1 <u>Waiver of Breach</u>. The failure of any Party to enforce at any time any provision of this Agreement (and related agreements between the Parties) shall not be construed as a waiver of such provision, nor in any way affect the validity of this Agreement (or any related agreements between the Parties) or the right of any Party thereafter to enforce each and every provision. No waiver of any breach of this Agreement (or any related agreements between the Parties) shall be held to constitute a waiver of any other breach, unless expressly done so in writing and signed by the Party against whom the waiver is asserted.

8.2 <u>Severability</u>. If any provision of this Agreement is rendered invalid or unenforceable by any act of Congress or of the State Legislature or by any regulation promulgated by officials of the United States or the applicable state agency, or declared invalid or unenforceable or null and void by any court of competent jurisdiction, such provision shall be severed from this Agreement and the remainder of the provisions of this Agreement shall remain in full force and effect.

LY

Case 1:20-cv-00618-CCE-JLW    Document 2    Filed 07/07/20    Page 35 of 55

8.3 <u>Effect of Severable Provision</u>. If a provision of this Agreement is rendered invalid or unenforceable or declared null and void as provided in <u>Section 8.2</u> and its removal has the effect of materially altering the obligations of any Party in such manner as, in the judgment of the Party affected: (a) will cause serious financial hardship to such Party, (b) will substantially disrupt and hamper the mutual efforts of the Parties to implement the purposes of this Agreement, or (c) will cause such Party to act in violation of its Articles of Incorporation or Bylaws or equivalent organizational documents, the Party so affected shall have the right to terminate this Agreement upon ninety (90) days prior written notice to the other Party. During the notice period, each Party shall make a good faith effort to negotiate with the other Party to resolve the basis of the termination, and if such resolution is achieved to the satisfaction of each Party, the Agreement shall be modified to implement such resolution and, as so modified, shall continue in effect to the end of the then remaining term, subject, however, each Party's right to terminate in accordance with the Agreement as so modified.

8.4 <u>Amendments/Assignment</u>. Except as otherwise provided, all amendments to this Agreement must be agreed to and executed in writing by the Parties in advance of the effective date. Notwithstanding the foregoing, amendments required because of legislative or regulatory enactments shall not require the consent of Practice or the Company and shall be deemed to have amended the Agreement as of the effective date of such enactment without any express action by the Parties. This Agreement may be assigned by the Company without permission of the Practice, but the Practice is expressly prohibited from assigning any rights or responsibilities set forth by this Agreement with prior written permission of the Company.

8.5 <u>Authority, Approval and Enforceability</u>. This Agreement has been executed, delivered and authorized by each Party and each has all requisite power and legal capacity to execute and deliver this Agreement and all other documents and agreements executed and delivered or to be executed and delivered in connection with the transactions contemplated by this Agreement; to consummate the transactions contemplated by this Agreement; and to perform its obligations under this Agreement. Upon execution and delivery, this Agreement will constitute the legal, valid and binding obligation of each Party, enforceable in accordance with its terms. Lastly, the execution and the delivery of this Agreement shall not result in a breach of any agreement to which either Party or violate any applicable laws to which it is subject

8.7 <u>Notice</u>. Any notice required or desired to be given under this Agreement shall be in writing and shall be sent by certified mail, return receipt requested, postage prepaid, or overnight courier, or hand delivery to the addresses set forth below. Notices given hereunder shall be deemed given upon documented receipt. The addresses to which notices are to be sent may be changed by written notice given to the other Party in the manner set forth in this <u>Section 8.7</u>.

| If to the Company: | BioTE® Medical, LLC<br>1875 W. Walnut Hill Lane, Suite 100<br>Irving, Texas 75038<br>Attn: Gary S. Donovitz M.D., CEO |
|---|---|

LY

Case 1:20-cv-00618-CCE-JLW   Document 2   Filed 07/07/20   Page 36 of 55

| | |
|---|---|
| Copies to: | Mary Elizabeth Conlon<br>The Conlon Law Firm, P.C.<br>8333 Douglas Avenue, Suite 1414<br>Dallas, Texas 75225 |
| If to the Practice: | |
| Copies to: | |

8.8 <u>Headings</u>. The headings of the sections contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Master Agreement.

8.9 <u>Gender</u>. Whenever the masculine gender is used in this Agreement, it shall also mean and refer to the feminine gender whenever appropriate.

8.10 <u>Governing Law; Venue</u>. This Agreement shall be construed and enforced in accordance with the laws of the state of Texas without regard to its conflict of law's provisions. All suits permitted to be filed in a court of competent jurisdiction pursuant to the terms of this Agreement shall be resolved by a Texas state district court sitting in Tarrant County, Texas, and, if a federal claim or cause of action arises, in the federal courts located in Tarrant County, Texas, and each of the Parties consents to the jurisdiction of such courts, agrees to accept service of process by mail, and hereby waives any jurisdictional or venue defenses otherwise available to it with respect to such courts and/or such service of process, including but not limited to claims of forum non-conveniens.

8.11 <u>Entire Agreement</u>. All Exhibits to this Agreement are incorporated by reference into and made part of this Agreement. This Agreement constitutes the entire understanding and agreement of the Parties and supersedes any prior written or oral agreement pertaining to the subject matter.

8.12 <u>Counterparts</u>. This Agreement may be executed in several counterparts (which may include counterpart signed by facsimile), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

8.13 <u>Mediation</u>. The Parties shall, in good faith, attempt to settle any controversy or claim by any Party arising out of or relating to this Agreement by mediation. The Parties agree that, in the event that a conflict arises in the construction of this Agreement or in the exercise of any rights, obligations, responsibilities or duties, the disputing Party shall notify the other Party of such dispute. Upon receipt of such notice, the other Party shall have ten (10) business days to cure and resolve any such dispute. If such dispute cannot be resolved, the disputing Party shall then submit the dispute(s) to mediation (as defined in the Texas Civil Practice and Remedies Code) within sixty (60) days. In the selection of the mediator, the Parties shall each secure the names of

Case 1:20-cv-00618-CCE-JLW   Document 2   Filed 07/07/20   Page 37 of 55

five (5) mediators authorized by the Courts of Tarrant County, Texas and shall rank them in order of preference. The Parties will attempt, in good faith, to agree on a mediator from the Party lists. In the event the Parties cannot agree, they will ask a court of appropriate jurisdiction to appoint a mediator. The costs of mediation shall be borne by the Parties equally, unless the mediator assesses the costs otherwise. Except as otherwise set forth herein, if any Party commences formal legal proceedings or otherwise files any petition or complaint without first providing the opportunity to cure, and then participating in mediation pursuant to this paragraph, such Party shall bear the entire cost and expense of mediation. Notwithstanding the foregoing, the Company may bypass all provisions of this paragraph to initiate legal proceedings in order to obtain immediate injunctive relief, and after such relief is obtained, the Company shall proceed promptly with the dispute resolution process set forth herein.

8.14    References.    Unless specifically noted otherwise, all references to any recital, paragraph, section, subsection, schedule, exhibit, or other provision are references to recitals, paragraphs, sections, subsections, schedules, exhibits, or other provisions in this Master Agreement.

LY

**[Signatures on Following Page]**

Case 1:20-cv-00618-CCE-JLW    Document 2    Filed 07/07/20    Page 38 of 55

IN WITNESS WHEREOF, the Parties have caused this Master Agreement to be executed by their duly authorized officers or agents as of the date first written above.

BioTE® Medical, LLC

By: _J Mark Hincher, RPh_
BioTE Medical Executive

Thrive Integrated Health
Practice or Business Name (Please Print)

By: _____

Print Title: MD, _____

Print Name: Lari Young _____

Case 1:20-cv-00618-CCE-JLW   Document 2   Filed 07/07/20   Page 39 of 55

## EXHIBIT A
## LICENSED MARKS

  

- What could be better than being your best?
- BioTE®
- BioTE® Your Hormonal Balance, Your Well-Being
- BioTE® Life
- BioTE® Certified Provider
- BioTE® Certified
- Power, Protection, Perfection
- BioTE® Texas
- BioTE® Powering People with Pellets
- Your Hormones Your Life
- Fortify, Balance, Metabolize
- BioTE® Designed for YOU
- Low T? Not me…BioTE®
- Powering People with Pellets
- Be Your Best…BioTE®
- BioTE® Therapy
- BioTE® Method
- Recharge Your Life!
- The Pellet Press
- Body Balance Beyond Compare
- Health and Hormonal Harmony
- Give Your Body What It Knows…Bio-identical Testosterone and Estrogen
- Absolute Balance…Absolutely BioTE®!
- Age Healthier…Live Happier…

LY

2595245v.23          **BioTE Medical Trademark Licensing Agreement**

## BioTE® MEDICAL, LLC
## GENERAL NONDISCLOSURE AND NON-LIABILITY AGREEMENT

This Nondisclosure and Non-Liability Agreement ("Agreement") is made and entered into as of this date Jul 10, 2018          , between BioTE® Medical, LLC, and its parents, affiliates and related entities (collectively, the "Company" or "Us") and Lari Young                                                   [name of individual and/or name of entity], and Thrive Integrated Health                        [name of business or practice], and any related employee, partner, affiliate, agent under the direction thereof (collectively, "Recipient").

WHEREAS, Company and Recipient wish to discuss and evaluate a proposed business opportunity of mutual interest between Company and Recipient (the "Purpose").

WHEREAS, Recipient is exploring a potential professional association with the Company, whether through employment, consultation, brokerage, independent contract, partnership, joint venture, strategic alliance and/or another form of professional relationship or alliance, whether in connection with the Purpose or other business purposes.

WHEREAS, in connection with the Purpose, Company may disclose to Recipient certain confidential technical business and other information that Company desires Recipient to treat as confidential.

WHEREAS, in connection with the Purpose, Company may provide certain training (the "BioTE® Medical Training) in BioTE® Medical Therapy/Method, namely a pellet-based, non-synthetic, bio-identical hormone treatment technology proprietary to the Company.

WHEREAS, in connection with the exploration of such professional association, Recipient has requested and will otherwise be provided, directly or indirectly, either orally, in writing, or by inspection or observation, certain Confidential Information, as defined below.

WHEREAS, Company desires to be protected from divulgence of such confidential technical business and other information, and from Recipient's use of such confidential technical, business and other information to compete with Company.

NOW, THEREFORE, in consideration of the mutual promises contained herein, the parties agree as follows:

1. **"Confidential Information"** means any information disclosed by Company to Recipient, either directly or indirectly in writing, orally, or by Recipient's inspection or observation of tangible objects and things (including without limitation, documents, prototypes, formulas, formula inputs, trade secrets, dosage calculations, proprietary dosage systems, samples, plant and equipment, and processes) and intangibles. Confidential information includes without limitation, data, text, audio and visual media, logos, copy and information gleaned by Recipient through discussions with Company about Company proprietary information, including but not limited to: (a) copies of forms created by the Company in connection with their respective business practice, including but not limited to, Company and operating agreements, corporate documents and bylaws, billing forms, patient information forms, HIPAA forms and HIPAA related documents; (b) patient forms and charts; (c) any information, process or technology relating to patient, copyright, trademark and trade-name applications or any continuations, continuations in part, divisions or reissues thereof either existing, pending or intended for future registration; (d) information concerning Company plans, projections and future investments, future office locations, marketing and advertising strategies; (e) any written or oral hormone replacement therapy formula or modality constituting a proprietary technology utilized by Company; (f) any and all computer programs, software programs, system documentation, and materials utilized by Company in the operation of their business and (g) any and all marketing material, advertising material, employee handbooks and manuals, training handbooks and manuals, training videos, operation handbook and manual, infomercials, commercials, CD-ROM's, web videos, in physical format, web-based format or otherwise in connection with the Company's business through promotion, general information, solicitation and education. Confidential Information also includes information disclosed to Company by third parties, and thereafter disclosed to Recipient by Company. Without limiting the specificity of the foregoing, "Confidential Information" further includes (i) any and all information obtained from the BioTE® Medical Training, and (ii) any and all information and any idea in whatever form, tangible or intangible, pertaining in any manner to be the business of the Company, broadly defined as information that has or could have commercial value or other utility in the business in which the Company is engaged in or contemplates engaging, and all

LY

Case 1:20-cv-00618-CCE-JLW   Document 2   Filed 07/07/20   Page 41 of 55

information of which the unauthorized disclosure could be detrimental to the interests of the Company regardless of whether or not such information is deemed confidential and proprietary by the Company. Confidential Information also includes information disclosed to the Company by third parties, and therefore disclosed to the Recipient by the Company. Confidential Information does not include any information that Recipient can establish: (i) was publicly known or generally available in the public domain prior to the time of disclosure to Recipient by Company; (ii) became publicly known or generally available in the public domain after disclosure to Recipient by Company through no action or inaction of Recipient; or (iii) is in the possession of Recipient without confidentiality restrictions at the time of disclosure by Company as shown by Recipient's records in existence at the time of disclosure.

2. **Non-use and Nondisclosure.** Recipient shall not use any Confidential Information for any purpose other than the Purpose. Recipient shall not disclose Confidential Information to any third party unless authorized in advance in writing by Company. Recipient shall disclose Confidential Information to its employees or contractors only on a "need to know" basis, and only in those cases that: (i) such disclosure is necessary and required in furtherance of the Purpose; and (ii) the employee or employees to whom Confidential Information is disclosed previously have signed non-use and nondisclosure agreements at least as protective of Confidential Information as the provisions hereof. Recipient shall not, nor shall Recipient permit others to reverse engineer disassemble or decompile any formulas, prototypes, software or other tangible objects or things that contain constitute, embody or reflecting Confidential Information and that are provided to Recipients hereunder.

3. **Maintenance of Confidentiality.** Recipient shall take all reasonable measures to protect the secrecy of and to avoid the disclosure and unauthorized use of Confidential Information. Without limiting the foregoing, Recipient shall take at least those measures that it takes to protect its own most confidential information. Recipient shall not make copies of Confidential Information without prior written approval of Company. Recipient shall reproduce Company's proprietary rights notices on any copies of Confidential Information as such notices were set forth in or on the original Confidential Information. Recipient shall immediately notify Company in the event of any unauthorized use or disclosure of Confidential Information.

4. **Subpoena; Court Order.** If Recipient is requested, under the terms of a subpoena or order or other compulsory instrument issued by or under the authority of a court of competent jurisdiction or by a governmental agency, to disclose (a) all or any part of the Confidential Information, (b) the fact that the Recipient and the Company are taking place, or (d) any of the terms, conditions, or other facts with respect to any possible transaction resulting from such discussions or negotiations, it is agreed that Recipient will: (i) provide the Company with prompt written notice of the existence, terms, and circumstances surrounding such request or requirement, (ii) consult with the Company on the advisability of taking steps to resist or narrow that request, (iii) if disclosure of Confidential Information is required, furnish only such portion of the Confidential Information as the Recipient is advised by Recipient's counsel is legally required to be disclosed, and (iv) cooperate with the Company, at the request of the Company and at the Company's expense, in its efforts to obtain an order excusing the Confidential Information from disclosure, or an order or other reliable assurance that confidential treatment will be accorded to that portion of the Confidential Information that is required to be disclosed.

5. **Non-Competition.** For purposes of this Section 5, all references to Company shall be deemed to include Company's affiliates and subsidiaries. During the parties' business relationship and for a period of twenty-four (24) months after termination of the parties' discussions, Recipient hereby covenants with Company that during the term of this Agreement and for a period of twenty-four (24) months after termination of the parties' discussions, the Recipient shall not, directly or indirectly for its, his, or her own account, or as a partner, member, employee, advisor, or agent of any partnership or joint venture, or as a trustee, officer, director, shareholder, employee, advisor, or agent of any corporation, trust or other business organization or entity, own, manage, join, participate in, advise, permit its, his or her name to be used in connection with or be concerned in any way in the ownership, management, operation, or control of, or be connected in any manner with any business which is in competition with or competitive with Company or its affiliates. Notwithstanding the foregoing, in no event shall Recipient, directly or indirectly, for its, his, or her own account, or as a partner, member, employee, advisor, or agent of any partnership or joint venture, or as a trustee, officer, director, shareholder, employee, advisor, or agent of any corporation, trust or other business organization or entity, own, manage, join, participate in, advise, permit its, his or her name to be used in connection with or be concerned in any way in the ownership, management, operation, or control of, or be connected in any manner in any training of BioTE® Medical Therapy/Method or any derivation thereof, at any time, without the prior written consent of the Company.

Case 1:20-cv-00618-CCE-JLW    Document 2    Filed 07/07/20    Page 42 of 55

6. **Non-solicitation.** During the parties' discussions and for a period of twenty-four (24) months after termination of the parties discussions, Recipient shall not, directly or indirectly, (a) solicit, encourage, or take any other action which is intended to induce any employee of the Company or any other person or entity with a business relationship with the Company to terminate his or her employment or business relationship with the Company, or (b) solicit or interfere in any manner with the contractual, employment, or business relationship between the Company and any employee, supplier, customer, other person, or entity of the Company, or (c) otherwise solicit existing Company client base for services similar to those offered by Company.

7. **No Obligation.** Nothing herein obligates Company or Recipient to proceed with any transaction. Each party reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement.

8. **No Warranty.** ALL CONFIDENTIAL INFORMATION IS PROVIDED ON AN AS IS BASIS, AND COMPANY MAKES NO WARRANTIES, EXPRESS, IMPLIED OR OTHERWISE, REGARDING THE ACCURACY, COMPLETENESS OR PERFORMANCE OF ANY CONFIDENTIAL INFORMATION OR ANY BioTE® MEDICAL TRAINING INFORMATION. RECIPIENT ACKNOWLEDGES AND AGREES THAT COMPANY HEREBY DISCLAIMS ALL WARRANTIES OR CONDITIONS OF MERCHANTABILITY, SATISFACTORY QUALITY, AND FITNESS FOR A PARTICULAR PURPOSE, OR IMPLIED WARRANTIES ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE. RECIPIENT FURTHER ACKNOWLEDGES THAT THE BioTE® MEDICAL THERAPY/METHOD AND RELATED BioTE® TRAINING HAVE NOT BEEN APPROVED BY THE U.S. FOOD AND DRUG ADMINISTRATION OR ANY OTHER AGENCY.

9. **Return of Materials.** All documents and other tangible objects and things containing, constituting, embodying or reflecting Confidential Information, and all copies thereof, shall remain the property of Company and shall be promptly returned to Company upon Company's request.

10. **No License.** Nothing in this Agreement is intended to, nor shall anything in this Agreement, grant Recipient any rights in or to any patent, trademark, mask work, or copyright of Company. Nor shall this Agreement grant Recipient any right in or to Confidential Information, except as expressly set forth herein.

11. **Term.** This Agreement shall survive until such time as all Confidential Information disclosed hereunder becomes publicly known or generally available in the public domain through no action or inaction of Recipient.

12. **Remedies.** Recipient agrees that any violation or threatened violation of this Agreement will cause irreparable injury to Company, entitling Company to obtain injunctive relief in addition to all legal remedies.

13. **Conflicting Obligations.** Recipient hereby represents and warrants that Recipient has no outstanding agreement or obligation that is in conflict with any of the provisions of this Agreement, or that would preclude Recipient from complying with the provisions hereof. Recipient shall not enter into any such conflicting agreement.

14. **Attorney's Fees.** In any court action at law or equity permitted under this Agreement and brought by one of the parties to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, in addition to any other relief to which that party may be entitled.

15. **Consideration.** Recipient expressly acknowledges and agrees that Company's engagement in the Purpose and Company's disclosure to Recipient of Confidential Information constitutes full, adequate, and sufficient consideration to Recipient from Company for the duties, obligation, and covenants of Recipient under this Agreement. Company expressly acknowledges and agrees similarly with respect to the consideration received by it from Recipient under this Agreement.

16. **Reasonableness.** The restrictions set forth in this Agreement are considered by the parties to be fair and reasonable. Recipient acknowledges that the restrictions contained herein will not prevent Recipient from earning a livelihood.

LY

Case 1:20-cv-00618-CCE-JLW    Document 2    Filed 07/07/20    Page 43 of 55

17. **Severability**. Any term or provision of this Agreement that is held by a court of competent jurisdictions or other authority to be invalid, void or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction or other authority declares that any term or provision hereof is invalid, void or unenforceable, the parties agree that the court making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

18. **Miscellaneous**. This Agreement shall bind and inure to the benefit of the parties hereto, and to their successors and assigns. This Agreement shall be governed by the laws of the State of Texas without reference to conflict of laws principles. All disputes arising out of or relating to this Agreement shall be subject to the exclusive jurisdiction of the state and federal courts located in or near Tarrant County, Texas, and each party hereby consents to the personal jurisdiction thereof. This document contains the entire Agreement between the parties with respect to the subject matter hereof. Any failure to enforce any provision of this Agreement shall not constitute a waiver thereof or of any other provision hereof. This Agreement may not be amended, nor any obligation waived, except by writing and signed by both parties hereto.

19. **Sections and Other Headings**. The sections and other headings contained in this Agreement are for reference purposes only, and shall not affect in any way the meaning or interpretation of the terms of this Agreement.

20. **Survival**. This Agreement shall survive execution and termination of any other Agreement between any of the parties hereto unless specifically superseded, amended or terminated in a writing signed by each of the parties hereto.

**[Signature page follows]**    LУ

Case 1:20-cv-00618-CCE-JLW    Document 2    Filed 07/07/20    Page 44 of 55

**Recipient:**

Lari Young
_____
Recipient Name (Please Print)

_Lari Young_
_____
Signature

Thrive Integrated Health
_____
Practice or Practitioner's Name

MD,
_____
Print Title

Jul 10, 2018
_____
Date

**BioTE® MEDICAL, LLC.**

J Mark Hincher, RPh
_____
BioTE Medical Executive (Please Print)

_J Mark Hincher, RPh_
_____
Signature

Jul 10, 2018
_____
Date

Case 1:20-cv-00618-CCE-JLW    Document 2    Filed 07/07/20    Page 45 of 55

# END USER LICENSE AGREEMENT
## IMPORTANT – READ CAREFULLY

This End User License Agreement (this "Agreement") is a binding contract between you (the "Licensee", or "you") and BioTE®Medical, LLC. ("BioTE® Medical"). By using or accessing BioTE® Medical's website (the "Site"), web-based electronic program, software and services (all or any part of which are hereinafter referred to as the "Software"), and by clicking "ACCEPT", you accept and agree to be bound by this Agreement. **IF YOU DO NOT AGREE TO BE BOUND BY ALL OF THE TERMS, CONDITIONS AND LIMITATIONS OF THIS AGREEMENT YOU WILL NOT BE PROVIDED WITH ACCESS TO, OR ANY RIGHTS WHATSOEVER TO, THE SERVICES OR SOFTWARE.** Your use of the Software is governed by the version of the End User License Agreement in effect on the date you access the Site. BioTE® Medical may modify this Agreement at any time and without prior notice to you. This Agreement is in addition to any other agreements between you and BioTE® Medical.

Subject to the terms and conditions of this Agreement, including the payment of the applicable subscription fees, BioTE® Medical is granting to you a non-exclusive, non-transferable, limited right and license to access or use the Software on any computer owned by and used in connection with the same medical practice, provided that such computer(s) are located at the physical location of the medical practice (the "Authorized Practice"), for the period of the initial term of the subscription and any Renewal Term (as defined in Section 3 below) only. In addition to the BioTE® Medical web-based electronic program, the term "Software" includes any other programs, tools, internet or web-based services, components and any updates (e.g., maintenance, service information, help content, bug fixes, or maintenance releases) of the software that BioTE® Medical and/or its agents provide or make available to you.

**1. SCOPE.** This Agreement is applicable to (i) the Software and services to which the Licensee is being provided access by BioTE® Medical; which Software or services, or any part or component thereof BioTE® Medical may at any time update, revise, or alter; and (ii) any updates, upgrades or enhancements to any of the Software now or hereafter provided to the Licensee by BioTE® Medical.

**2. SOFTWARE LICENSE.**

(i) Use. The Licensee may access the Software and services which have been licensed to Licensee, on any computer owned by, and operated by and in, the Authorized Practice. The Software and services may only be accessed and used by members or employees of the Authorized Practice.

(ii) Transferability. The Licensee may only transfer the right to use and access the Software from one computer of the Authorized Practice to another computer of the Authorized Practice, provided the Software may be used solely in connection with, and in, the Authorized Practice. THE LICENSEE HEREBY AGREES NOT TO PERMIT ACCESS TO THE SOFTWARE AND SERVICES TO ANYONE OTHER THAN MEMBERS OR EMPLOYEES OF THE AUTHORIZED PRACTICE.

(iii) Reservation of Rights and Ownership. The Software is licensed, not sold, and BioTE® Medical reserves all rights not expressly granted to you in this Agreement. The Software is protected by copyright, trade secret and other intellectual property laws. BioTE® Medical owns the title, copyright, and other worldwide intellectual property rights in the Software and all copies of the Software. This Agreement does not grant you any rights to trademarks or service marks of BioTE® Medical.

**3. REGISTRATION.** You must register to use the Software and (i) provide true, accurate, current and complete information as prompted in the sign-up process (the "Registration Data"), and (ii) maintain and promptly update the Registration Data to keep it accurate, current and complete. If you provide any Registration Data that is inaccurate, not current or incomplete, or BioTE® Medical has reasonable grounds to suspect is inaccurate, not current or incomplete, BioTE® Medical may, in its sole discretion, suspend or terminate your account and refuse any and all current or future access to and use of the Software and services (or any portion thereof).

**4. TERM AND TERMINATION.** This Agreement may be terminated by either party at any time. Without prejudice to any other rights to which it may be entitled, BioTE® Medical may terminate this Agreement with immediate effect if Licensee: (a) ceases conducting business in the normal course, or (b) fails to timely remedy a breach of this Agreement. Upon termination, Licensee

Case 1:20-cv-00618-CCE-JLW    Document 2    Filed 07/07/20    Page 46 of 55

shall immediately cease to use the Software, and BioTE® Medical shall have the right to terminate any access codes previously provided to the Licensee.

**5. PASSWORD/ACCESS SECURITY CODE.** If Licensee has been provided with a designated password or access code, Licensee is solely responsible for all activities that occur in connection with such password or access code. Licensee should take steps to protect the confidentiality of such password or access code and should notify BioTE® Medical immediately if it becomes aware of any disclosure, loss, theft or unauthorized use of such access code or password.

**6. RESTRICTIONS.** The Software is protected by United States copyright law, international treaty provisions, and trade secret, trade dress and other intellectual property laws. Unauthorized copying of or access to this Software is expressly forbidden. You may not copy, disclose, loan, rent, sell, lease, give away, give your password to or otherwise allow access to this Software by any other person, other than to members or employees of the Authorized Practice. You agree to only use this Software to view and/or process data that you are legally authorized by the data provider and/or the patient to view or access and not to sell, license, repackage, distribute or make any commercial uses of the data provided through BioTE® Medical. You are not licensed or permitted under this Agreement to do any of the following and shall not allow any third party to do any of the following: (a) misuse, abuse, or overuse beyond reasonable amounts, this Software; (b) attempt to view, disclose, copy, reverse engineer, disassemble, decompile or otherwise examine the source program code or other technical details of this Software; (c) access or attempt to access any other BioTE® Medical systems, programs or data that are not made available for public use; (d) copy, reproduce, republish, upload, post, transmit, resell or distribute in any way the material from the Site; (e) permit any third party to benefit from the use or functionality of the Software via a rental, lease, timesharing, service bureau, or other arrangement; (f) transfer any of the rights granted to you under this Agreement; (g) work around any technical limitations in the Software, use any tool to enable features or functionalities that are otherwise disabled in the Software; (h) perform or attempt to perform any actions that would interfere with the proper working of the Software, prevent access to or the use of the Software by BioTE® Medical's other licensees or customers, or impose an unreasonable or disproportionately large load on BioTE® Medical's infrastructure; or (i) otherwise use the Software except as expressly allowed under this Agreement. You may be held legally responsible for any copyright infringement, violation of privacy law or other unlawful act that is caused or incurred by your failure to abide by the terms of this Agreement.

**7. USER GENERATED CONTENT.** In connection with your use of the Software and the Site, you may upload and/or generate content ("User Generated Content"). BioTE® Medical shall have no obligation or liability in connection with any publications, modifications, alterations or subsequent uses of such User Generated Content by you or any third party. By uploading or entering such User Generated Content on the Site, you automatically grant, and you represent and warrant that you have the right to grant, to BioTE® Medical an irrevocable, perpetual, non-exclusive, transferable, fully paid, worldwide license (with the right to sublicense) to use, copy, publicly perform, publicly display, reformat, translate, excerpt (in whole or in part), and distribute such User Generated Content for any purpose on or in connection with the Site, to prepare derivative works of, or incorporate into other works, such User Generated Content, to the extent permitted by law, and to grant and authorize sublicenses of the foregoing. Notwithstanding the foregoing, you acknowledge and agree that all output generated from the Site shall remain the sole property of BioTE® Medical. You further acknowledge and agree that any questions, comments, suggestions, feedback, ideas or other information about the Site or the Software provided by you to BioTE® Medical are non-confidential and shall become the sole property of BioTE® Medical, and may be used by BioTE® Medical in any manner whatsoever, without the need to obtain authorization and without compensation to you.

**8. WARRANTY AND DISCLAIMER.** BIOTE® MEDICAL DISCLAIMS ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT. THE SOFTWARE AND SERVICES ARE PROVIDED "AS IS". BIOTE® MEDICAL DOES NOT WARRANT ALL OR ANY OF THE SERVICES OR THE SOFTWARE OR THAT THE INTENDED FUNCTIONS WILL MEET LICENSEE'S REQUIREMENTS, OPERATE WITHOUT INTERRUPTION OR BE ERROR FREE. BIOTE® MEDICAL DOES NOT WARRANT THAT ANY OF THE SERVICES OR THE SOFTWARE BEING PROVIDED IS FREE FROM DEFECTS: BIOTE® MEDICAL AGREES TO USE COMMERCIALLY REASONABLE EFFORTS TO CORRECT ANY MATERIAL DEFECTS, BUT DOES NOT REPRESENT OR WARRANT THAT ANY DEFECTS OR INACCURACIES WILL BE CORRECTED. THE SERVICES MAY INCLUDE RECOMMENDED DOSAGES BASED ON INFORMATION PROVIDED BY YOU; HOWEVER, YOU ARE SOLELY RESPONSIBLE FOR ENSURING THAT THE RECOMMENDED DOSAGES ARE APPROPRIATE FOR THE PARTICULAR PATIENTS. THE PARTIES ACKNOWLEDGE AND AGREE THAT THEY HAVE FULLY CONSIDERED THE FOREGOING ALLOCATION OF RISK AND FIND IT REASONABLE, AND THAT THE FOREGOING LIMITATIONS ARE AN ESSENTIAL BASIS OF THE BARGAIN BETWEEN THE PARTIES. LICENSEE ACKNOWLEDGES AND AGREES THAT THE CONSIDERATION WHICH BIOTE® MEDICAL IS RECEIVING HEREUNDER

DOES NOT INCLUDE ANY CONSIDERATION FOR ASSUMPTION BY BIOTE® MEDICAL OF THE RISK OF LICENSEE'S CONSEQUENTIAL OR INCIDENTAL DAMAGES WHICH MAY ARISE IN CONNECTION WITH LICENSEE'S USE OF ANY OR ALL OF THE SERVICES OR SOFTWARE.

**9. LIMITATION OF LIABILITY AND DAMAGES.** THE ENTIRE CUMULATIVE LIABILITY OF BIOTE® MEDICAL, ITS SUPPLIERS, AND SERVICE PROVIDERS FOR ANY REASON ARISING FROM OR RELATING TO THIS AGREEMENT SHALL BE LIMITED TO THE AMOUNT PAID BY YOU FOR THE SOFTWARE AND SERVICES, UNLESS OTHERWISE SEPARATELY AGREED TO EXPRESSLY BY BIOTE® MEDICAL IN WRITING. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, BIOTE® MEDICAL, ITS SUPPLIERS, AND SERVICE PROVIDERS SHALL NOT BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, EXEMPLARY, OR CONSEQUENTIAL DAMAGES OR FOR ANY OTHER DAMAGES OF ANY NATURE RELATING TO LOSS OF BUSINESS, TELECOMMUNICATION FAILURES, THE LOSS, CORRUPTION OR THEFT OF DATA, VIRUSES, SPYWARE, LOSS OF PROFITS OR INVESTMENT, USE OF THE SOFTWARE WITH HARDWARE OR OTHER SOFTWARE THAT DOES NOT MEET BIOTE® MEDICAL'S SYSTEMS REQUIREMENTS OR THE LIKE, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR OTHERWISE, EVEN IF BIOTE® MEDICAL, ITS SUPPLIERS, SERVICE PROVIDERS, OR ITS REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND EVEN IF A REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

**10. GENERAL.** This Agreement embraces the full, complete understanding of the parties as to the subject matter hereof, and may not be altered or modified, except by written amendment or collateral agreement which expressly refers to this Agreement and which is duly executed by BioTE® Medical and the Licensee's duly authorized representative. The parties expressly agree that this Agreement supersedes all prior or contemporaneous proposals and all other oral or written understandings, representations, conditions and other communications between the parties relating to such subject matter. Licensee shall not transfer or assign this Agreement or any rights or obligations hereunder under operation of law, change of control, or otherwise, without the prior written consent of BioTE® Medical. Any attempted assignment or transfer in violation of the foregoing will be void. This Agreement will be governed and interpreted in accordance with the laws of the United States and the State of Texas, excluding the application of its conflicts of law rules. In the event of litigation between the Licensee and BioTE® Medical concerning the Software and/or services the prevailing party in the litigation will be entitled to recover reasonable attorneys' fees and expenses from the other party. If any part of this Agreement is found void and unenforceable, it will not affect the validity of the balance of the Agreement, which shall remain valid and enforceable according to its terms. The Licensee agrees that any software will not be shipped, transferred or exported into any country or used in any manner prohibited by the United States Export Administration Act or any other export law, restrictions or regulations. BioTE® Medical does not control, is also not responsible for, and accepts no liability for the privacy practices of its subscribers or the privacy practices of other physicians, medical facilities or other third parties, to whom BioTE® Medical may transmit information in accordance with the provisions of this Agreement. Licensee agrees to indemnify and hold BioTE® Medical and its members, managers, directors, shareholders, agents, officer and employees, harmless for, from and against any and all claims, liabilities, damages and losses, including legal fees and expenses, due to or arising out of Licensee's use of the Software, services, content, Site or breach of this Agreement.

*By signing below I hereby acknowledge that I have read, and fully understand and accept the terms and conditions of this Agreement.*

**Licensee:**

Lari Young
_____
Print Full Name

MD,
_____
Print Title

*Lari Young*
_____
Signature

Jul 10, 2018
_____
Date

Case 1:20-cv-00618-CCE-JLW    Document 2    Filed 07/07/20    Page 48 of 55

**BioTE® MEDICAL DOSAGE FORMULA USER INFORMATION**

Name:

Lari Young

Business Address:

Thrive Integrated Health

2512 Reynolda Rd.

Office Phone: 336.406.9393

E-Mail Address: Accounting@theive4health.com

LY

**BioTE® Medical, LLC.**
**1875 West Walnut Hill Lane, Suite 100**
**Irving, TX 75038**
**Phone: 972-850-7292**
**Fax: 888-496-0394**
**www.biotemedical.com**





EXHIBIT

B

PENGAD 800-631-6989

May 5, 2020

Thrive Integrated Health
Attn: Lari Young, MD
2512 Reynolda Rd.
Winston-Salem, NC 27106
336-306-9393

Re:     Notice of Breach and Termination of that certain Services Agreement ("Agreement") dated July
        10, 2018 between BioTE Medical, LLC ("BioTE Medical") and Thrive Integrated Health
        ("Practice").

Dear Lari Young, MD:

A recent review indicates that since joining BioTE Medical in September 2016, there has been a significant decrease in your procedures reported. We were notified by Regional Manager, Bob Johnston, that you have not reported since February 2020. Mr. Johnston has reached out on multiple occasions and was informed that you felt BioTE was no longer affordable, and you intended to source pellets from another supplier. Territory Manager, Shannon DuBose, also offered operational support, which your Practice declined.

Due to the failure to comply with Article 2, Sub-Section 2.2, Adoption of Program Guidelines by Practice of the above-referenced Agreement, this letter shall serve as written notice that BioTE Medical is terminating the Services Agreement effective as of May 5, 2020.

In accordance with the Agreement, if this Agreement is terminated for any reason, the Practice shall:

        (1)     comply with all ethical and legal duties with respect to Patients arising as a result of the termination, including but not limited to providing each Patient an opportunity to continue in the Program and receive the Services from an authorized Licensee Service provider and/or Licensor and/or its Affiliates;

        (2)     provide to each of Practice's Patients receiving the Services the names and contact information of authorized, Licensee Service providers and/or Licensor and/or its Affiliates as provided to Practice by Licensor, so that Patients may continue and complete their participation in the Program, and Practice shall identify each such Patient to Licensor in writing so that Licensor or its Affiliates may facilitate their transfer to an authorized provider of the Services;

        (3)     immediately return to Licensor any and all trocars, bio-identical pellets, documents, materials, and all other items provided to Practice by Licensor, including, without limitation, the Program Guidelines, Instructional Materials and Licensor manuals, and all other documentation related to Licensor business, and all of the rights of the Practice to use any Intellectual Property of Licensor, shall terminate; and

        (4)     immediately pay to Licensor any accrued or earned but unpaid Fees.

BioTE® Medical, LLC. | 1875 West Walnut Hill Lane, Suite 100 | Irving, TX 75038 | www.biotemedical.com

Regional Manager, Bob Johnston, will be available to assist you with the pellet inventory, if any, and retrieval of all BioTE Medical property including trocars, marketing materials, training manuals, and educational materials. We are enclosing pre-paid shipping labels to facilitate any returned items and the return of any pellets to AnazaoHealth Pharmacy.

Permission to use BioTE Medical intellectual property is also terminated effective as of May 5, 2020. Any and all references to BioTE Medical should be removed from the Practice website, as well as any other media and/or social media sites.

We respectfully ask that the Practice and Practice Practitioners comply with all post-termination terms and conditions of the Agreement, including without limitation, all non-competition and non-disclosure provisions set forth in Article 6, Section 6.2 of the Agreement.

As stated in Section 6.2 (b), if the Practice uses such alternative or competing pellet-based bio-identical hormone therapy or treatment following termination of the Agreement, the Practice agrees to compensate the Company for the Residual Benefit in an amount equal to the greater of; (a) $2,000 – the minimum Residual Benefit Fee, or (b) the actual calculated best consecutive 3 months average Management Fee previously paid to BioTE during the previous 12 month period. Such Residual Benefit Fees, if applicable, for Thrive Integrated Health are payable on the first (1st) day of each month for a total of twelve (12) months in the amount of eight thousand seven hundred eight dollars and thirty-three cents ($8,708.33). Residual Benefit Fees should be made payable to:

> **BioTE Medical, LLC**
> **1875 W. Walnut Hill Lane, Suite 100**
> **Irving, Texas 75038**

BioTE Medical reserves the right to pursue legal action to recover any outstanding debt or property without further notice to the Practice. Capitalized terms used in this letter but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement. This letter shall not be construed as a waiver of any rights or claims that BioTE Medical may have. All such rights and claims are hereby expressly reserved.

Should you have any questions to discuss this matter further, I can be reached at 972-850-7292 ext. 132.

Sincerely,

Cary Paulette
Vice President of Sales
BioTE® Medical, LLC

Enclosures:    (1) FedEx Prepaid Return Shipping Label to BioTE Medical Corporate
                (1) FedEx Prepaid Return Shipping Label to AnazaoHealth Pharmacy
                (1) Form: AnazaoHealth Pharmacy Final Pellet Inventory Return Form

cc:    Marybeth Conlon, Esquire    *(via electronic mail only)*



# Pellet Return Form

Practitioner Name _____

Practitioner Address _____
_____

Practitioner DEA# _____

Date Shipped _____

Practitioner Signature _____

All fields must be filled out

Pharmacy Name -  AnazaoHealth Corporation

Pharmacy Address - 7465 W. Sunset Rd., Suite 1200
Las Vegas, NV 89113

Pharmacy DEA# - RA0476451

Date Received/Signature _____

*Please note that shipping costs are the responsibility of the practice.*

| Returned Pellet | Quantity Expired | Quantity Dropped | Broken Pellets | Lot Number(s) |
|---|---|---|---|---|
| Estradiol-6mg | | | | |
| Estradiol-10mg | | | | |
| Estradiol-12.5mg | | | | |
| Estradiol-15mg | | | | |
| Testosterone-25mg | | | | |
| Testosterone-37.5mg | | | | |
| Testosterone-50mg | | | | |
| Testosterone-87.5mg | | | | |
| Testosterone-100mg | | | | |
| Testosterone-200mg | | | | |
| Testosterone-75mg/Anastrozole-4mg | | | | |
| Testosterone-100mg/Anastrozole-4mg | | | | |

Return Facilitator Signature: _____  *Date:_____

## Next Steps:

1. Fill out this form in its entirety with signatures. This will not be processed unless all fields are complete.

2. You MUST include a copy of this sheet inside the package to be sent to the pharmacy for proper disposal. You will also need to keep a copy on file per DEA regulations.

AnazaoHealth Corporation, 7465 W. Sunset Rd., Suite 1200, Las Vegas, NV 89113

THE CONLON | LAW FIRM
A PROFESSIONAL CORPORATION

8333 Douglas Avenue, Suite 1414
Dallas, Texas 75225
Main: 214.750.1200
Direct: 214.727.0973
Fax: 214.890.9920
www.theconlonlawfirm.com

May 27, 2020

**VIA ELECTRONIC MAIL AND**
**CMRRR # 7016 1370 0001 0118 8631**

Thrive Integrated Health, P.A.
Lari Young, MD
2512 Reynolda Rd.
Winston-Salem, NC 27106

Re:  Breach of contractual obligations owed to BioTE Medical, LLC.

Dear Dr. Young:

The undersigned counsel has been retained to represent BioTE Medical, LLC ("BioTE") in connection with its pursuit of claims arising from your breach of obligations owed to BioTE. Unless otherwise set forth herein, all capitalized terms used in this letter shall have the same meanings as set forth in the Agreement (defined below).

As you will recall, on or about July 10, 2018, you and your Practice, on the one hand, and BioTE, on the other, entered into a Services Agreement (the "Agreement"). Pursuant to the Agreement, you promised, among others, to remit payment of Residual Benefit fees to BioTE in the event you chose to offer a similar or competing pellet-based bio-identical hormone therapy or treatment following the termination of the Agreement. The foregoing obligation survived termination of the Agreement.

On April 9, 2020, BioTE notified you in writing of your breach of the Agreement and offered you an opportunity to cure such breach. When you failed to respond in any way, let alone cure the breach identified by BioTE, on May 5, 2020, BioTE provided written notice to you of its termination of the Agreement (effective immediately). In that same notice (the "Termination Letter"), BioTE reminded you of your obligation to comply with all post-termination obligations of the Agreement. Additionally, BioTE reminded you of your obligation to return immediately to BioTE any and all supplies provided to you by BioTE (including but not limited to, pellets, trocars, Instructional Materials, manuals) (collectively, the "Property"). BioTE also reminded you of your obligation to remove any and all references to BioTE® Medical and other licensed trademarks from all social media, websites, and any other forms of electronic correspondence or presence maintained or utilized by the Practice or any of the Practice Practitioners.

In the Termination Letter, BioTE specifically notified you of the Residual Benefit amount that was owed each month for a period of twelve (12) months pursuant to Section 6.2(b) of the Agreement ($8,708.33) should the Practice or any of its Practitioners wish to continue offering pellet-based bio-identical hormone therapy or treatment following termination of the Agreement.



BioTE never received any payment(s) of the Residual Benefit but learned that you were continuing to offer pellet-based bio-identical hormone therapy to your patients. Further, despite having been terminated as a BioTE Practice effective May 5, 2020, you are continuing to represent to the public that you are a licensed BioTE® Medical provider. Specifically, as of the date of this letter, your Practice's website currently refers to BioTE® Medical and utilizes licensed trademarks of BioTE. Also, as of the date of this letter, your Practice has failed to return all of the Property that belongs to BioTE and has instead wrongfully retained possession of such Property without BioTE's authorization or consent. This is unacceptable.

The aforementioned conduct constitutes multiple violations of your post-termination obligations under the Agreement. By this letter, formal demand is made that you and your Practice immediately: (1) remit payment of the Residual Benefit owed to BioTE in compliance with Section 6.2(b) of the Agreement; (2) remove all references to BioTE® Medical and its other licensed trademarks from all social media, websites, and any other forms of electronic correspondence or presence maintained or utilized by the Practice or any of the Practice Practitioners; and, (3) return to BioTE all of BioTE's Property within your possession, custody, or control.

Due to the importance of this matter to BioTE and to ensure protection of its valuable rights, we request that you contact us no later than seven business (7) days from the date of this letter (i.e., by no later than June 5, 2020) (by email, marybeth@theconlonlawfirm.com, or by regular mail) with confirmation that you have complied with the above-referenced demands.

Please know that BioTE is firmly committed to enforcing the post-termination obligations of the Agreement. Should you fail to respond as requested within this time frame, we will have no choice but to interpret your lack of response as hostile, and proceed with taking whatever steps are necessary to ensure the protection of BioTE's valuable rights including, without limitation, the filing of a lawsuit in Texas, to enforce the Agreement and recover the fees that are owed to BioTE as well as the Property you wrongfully converted.

We look forward to receiving your cooperative response.

Very truly yours,

Mary Elizabeth Conlon

cc:    Cary Paulette        (*via electronic mail only*)

FedEx Ship Manager - Print Your Label(s)

ORIGIN ID:INTA        (336) 723-7200
TIMOTHY NERHOOD
HENDRICK BRYANT NERHOOD
SANDERS & OTIS, LLP
723 COLISEUM DRIVE, SUITE 101
WINSTON-SALEM, NC 27106
UNITED STATES US

SHIP DATE: 04JUN20
ACTWGT: 1.00 LB
CAD: 102323643/INET4220

BILL SENDER

TO  **PROCESS AGENT**
**CAPITOL CORPORATE SERVICES, INC**
**120 PENMARC DRIVE**
**SUITE 118**
**RALEIGH NC 27603**
(800) 345-4647              REF: THRIVE
INV:
PO:                                    DEPT:

56BJ1/C7DD/FE4A

FedEx.
Express

E

MON - 08 JUN 4:30P

** 2DAY **

TRK# 0201  **7706 2892 5507**

ASR

27603

**SH SOPA**

NC-US  RDU

6/4/2020